## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| YANGTZE MEMORY TECHNOLOGIES, INC., *2953 Bunker Hill Lane, Suite 206, Santa Clara, California 95054*, <br><br> and <br><br> YANGTZE MEMORY TECHNOLOGIES CO., LTD., *No. 88 Weilai 3rd Road, East Lake High-tech Development Zone, Wuhan, Hubei, 430205 China*, <br><br> Plaintiffs, <br><br> v. <br><br> MICRON TECHNOLOGY, INC. *8000 South Federal Way, Boise, Idaho 83716*, <br><br> and <br><br> DCI GROUP AZ, L.L.C, *2000 K Street NW, Washington, D.C. 20006*, <br><br> Defendants. | No. 25-cv-1795 |

## **COMPLAINT**

Plaintiffs Yangtze Memory Technologies Company, Ltd., and Yangtze Memory Technologies, Inc. (collectively, "YMTC" or "Plaintiffs"), bring this lawsuit against Defendants DCI Group AZ, LLC ("DCI") and Micron Technology, Inc. ("Micron") (collectively, "Defendants").  YMTC's Complaint is based on the following allegations, which YMTC makes on personal information as to its own acts and on information and belief as to all others, based on its reasonable investigation.

## NATURE OF THE ACTION

1.      Flash memory chips are the means by which smart phones, TVs, cloud computing centers, and other devices store massive amounts of data, even after the device is turned off. They are not the processors of that data.  They are the repositories where the data resides. Without them, the technology age we enjoy would not exist.  In 2023, flash memory product sales in the United States exceeded $75 billion annually.  They are the subject of intense design development and market competition.

2.      Although a newcomer, YMTC is one of the world's leading developers and manufacturers of 3D NAND flash memories.  Defendant Micron is one of YMTC's primary competitors.  But for several years, Micron has lagged behind YMTC in innovation and product performance.  Unable to compete fairly, Micron has worked in concert with Defendant DCI to erect a sophisticated and unlawful "astroturfing" campaign—a deceptive marketing scheme—to damage YMTC's reputation and business for their own profit.

3.      This scheme seeks to destroy YMTC's reputation and business by spreading xenophobic lies that YMTC's market-leading flash memory chips are capable of being used to spy on millions of Americans who use the devices in which the chips are embedded, at the behest of the Chinese Communist Party or its People's Liberation Army.

4.      Defendants' statements are false and unlawful.  And Defendants know that.  They know, for example, that their accusations cannot be true because a memory chip is incapable of transmitting its data to another device.  And the fact that Plaintiff YMTC was founded in China does not mean that it is a tool of the Communist Party or the Chinese military.  Defendants know that, too.

5.    Defendants' lies about YMTC and its products have inflicted substantial damage by disrupting YMTC's business relationships and harming its reputation and goodwill. That was Defendants' objective. This sham marketing scheme must be stopped, and Defendants must compensate YMTC for the harm they have caused.

6.    YMTC has developed and patented technologies that enable the production of better flash memories, having more capacity and a lower per-bit cost. YMTC's innovations have not gone unnoticed. At the 2018 Flash Memory Summit, YMTC received the award for the Most Innovative Flash Memory Start-up Company, was recognized as one of "the most creative and ambitious startup companies," and was "applauded" for "becoming a market disruptor and champion of the storage industry." Since then, YMTC has continued to innovate. At the 2022 Flash Memory Summit, YMTC received the award for Most Innovative Memory Technology for YMTC's Xtacking® 3.0 3D NAND Architecture.

7.    No longer an upstart, YMTC has become a key player in the global 3D NAND market. In November 2022, TechInsights, which analyzes and tracks the flash memory market, described YMTC's accomplishments as "nothing short of amazing"—YMTC "is now the leader in 3D NAND flash," having "leap-frogged Micron," another major player in the 3D NAND space.[1] Micron is threatened by YMTC's ascension.

8.    Saddled with outdated and lesser-performing products, Defendant Micron has responded to YMTC's surge with a sham marketing scheme to spread lies about YMTC and its products. As Bloomberg Businessweek reported in an article titled *Dell, Micron Backed a Group Raising Alarms on Rivals' China Ties*, Defendant Micron funded a website called "China Tech Threat" or "CTT," run by Defendant DCI. *See* **Exhibit 1**.[2]

9.    Although the Micron-funded China Tech Threat purports to be focused on policy, according to Bloomberg, China Tech Threat is engaged in "astroturfing," the practice of cleverly

---

[1]   *YMTC's Xtacking 3.0, first to 200+ layers*, TechInsights, https://techinsights.com/disruptive-event/ymtc-232l-tlc-3d-nand.

[2]   Brody Ford, *Dell, Micron Backed a Group Raising Alarms on Rivals' China Ties*, Bloomberg Businessweek (Jan. 25, 2024), https://bloomberg.com/news/articles/2024-01-25/dell-micron-backed-a-group-criticizing-chinese-rivals.

disguising the corporate messaging of businesses (such as Micron), as grassroots advocacy.  *See* Ex. 1.  The Bloomberg article further identified China Tech Threat as a "project of DCI Group," a public affairs and consulting firm with a documented history of "astroturfing."

10.    In an interview concerning Bloomberg's reporting, John Strand, founder and CEO of Strand Consult (a firm involved with China Tech Threat), admitted that "[o]n the content on China Tech Threat, we have made money," as reported by the non-partisan journalism website NOTUS.  **Exhibit 2** at 3.[3]  On information and belief, Defendants Micron and DCI paid individuals and entities associated with China Tech Threat, including Strand Consult and Roslyn Layton, to disseminate favorable messages about Micron's products and disparaging messages about YMTC's competing products.

11.    The Micron-funded and DCI-directed China Tech Threat disinformation campaign extended beyond YMTC.  As Bloomberg reported, China Tech Threat also targeted Lenovo, another Chinese technology company, at the behest of Dell, falsely claiming that Lenovo's sponsorship of a video game tournament at a U.S. Navy base constituted "infiltration" of military facilities.  *See* Ex. 1 at 5.  This demonstrates China Tech Threat's, and by extension DCI's and Micron's, willingness to disseminate false and misleading information to advance the interests of its corporate sponsors.

12.    China Tech Threat began its Micron-funded and DCI-directed disinformation campaign against YMTC as early as September 2020, publishing outlandish and demonstrably false statements.  For example, China Tech Threat falsely claimed that YMTC was linked to "criminal activity, including a Social Security spoofing scam, identity theft and cyber extortion." **Exhibit 3**.[4]  YMTC denies such scurrilous allegations and there is no basis to support that fiction; China Tech Threat made it up with no citation.  *See id.*  China Tech Threat's website also

---

[3]  Byron Tau, *Are America's Tech Companies Fanning the Flames of Anti-China Sentiment?*, NOTUS (July 29, 2024), https://www.notus.org/technology/america-tech-companies-anti-china-sentiment.

[4]  *As YMTC Booms, China Aims to Dominate Flash Memory Industry*, China Tech Threat (Jan. 4, 2021), https://chinatechthreat.com/as-ymtc-booms-china-aims-to-dominate-flash-memory-industry

includes a page titled "China's Army to Infiltrate iPhones with YMTC Chips" dedicated to spreading falsehoods inuring to Micron's commercial benefit.

13.    On June 8, 2022, China Tech Threat, under the direction of DCI and Micron, published a report titled *Silicon Sellout: How Apple's Partnership with Chinese Military Chip Maker YMTC Threatens National Security*. **Exhibit 4** (CTT Report). The report repeatedly implores "Apple [to] voluntarily end its partnership with YMTC" and "source its chips from existing suppliers like Micron[.]" *Id.* at 4. It warns that "the Apple-YMTC deal will likely hasten the exit of an existing memory chip maker from a democratic country" and "could put at least one major non-Chinese semiconductor producer out of business"—highlighting that "[t]he only American company" leading the memory market is "the Idaho-based Micron, which makes both DRAM and NAND chips." *Id.* at 5-6, 8.

14.    The CTT Report also uniquely airs Micron's grievances against its competitors. For example, the CTT Report accuses a Chinese chipmaker of "hir[ing] away Micron engineers and encourag[ing] them to steal Micron trade secrets." Ex. 4 at 7. The allegation of encouraging theft is false. The Report does not discuss allegations of theft of any other chipmaker's intellectual property. This demonstrates the report's true purpose as a tool for advancing Micron's commercial agenda.

15.    The CTT Report's central claim—that "YMTC chips equipped with spyware and installed on Apple devices could funnel collected data back to Beijing" and "exfiltrate data," compromising "iPhone users' security and privacy"—is demonstrably false. Ex. 4 at 4, 10-11. YMTC's memory devices store bits of data (0s and 1s); they cannot execute code to "funnel" or "exfiltrate" data. YMTC's memory devices store "bits," zeroes and ones. Memory devices—YMTC's or others—cannot execute code to "funnel" or "exfiltrate" data to Beijing or anywhere else. Memory chips lack the most basic components necessary for remote control and wireless communications—e.g., antennas, modems, RF processors, and more. And YMTC would have absolutely no ability to manufacture a chip in such a way as to clandestinely utilize those parts of a mobile device without the device manufacturer knowing.

16.     And Defendants know this.  Defendant Micron is a leading semiconductor manufacturer with deep technical expertise.  Defendant DCI presents itself as a sophisticated public affairs firm and has worked extensively with technology and telecommunications companies, including Micron, understanding that memory chips store data, not execute code such as spyware.  With this collective experience, Defendants know, or should know, that their statements about YMTC's products are false.  Their expertise renders their dissemination of false information even more egregious.

17.     China Tech Threat's reports and statements directly benefited Micron, both commercially and reputationally.  Micron faced pricing pressure and the need to improve manufacturing efficiency due to YMTC's emergence as a competitor.  With a limited number of major chip manufacturers globally, a failed deal for YMTC materially increased Micron's likelihood of securing those deals, a dynamic that played out in the market.

18.     Micron's objective was clear: eliminate YMTC as a competitor.  China Tech Threat's false and misleading statements were part of an ongoing scheme orchestrated by Defendants DCI and Micron, and potentially others, to damage YMTC and protect Micron's market share.  As Bloomberg reports, "[w]hile CTT presents as a standalone organization, it is actually a project of DCI Group, a public affairs and consulting firm with a history of 'astroturfing,' the technique of disguising corporate messaging as grassroots advocacy, according to people familiar with the matter and documents viewed by *Bloomberg Businessweek*."  Ex. 1 at 2-3.  On information and belief, Micron is a client of DCI.  *See id.*

19.     The falsehoods Defendants DCI and Micron have spread through China Tech Threat have harmed YMTC's reputation and business relationships.  They have also hurt U.S. consumers.  3D NAND flash memory is vital technology for many of the digital products that consumers have come to depend upon and enjoy, such as smartphones, laptops, and tablet computers, as well as for the data centers and enterprise storage solutions in which 3D NAND is used.  Competition and innovation in the NAND memory space benefit consumers, as competition and innovation lead to better products at better prices.  Attempts to stifle competition and hinder innovation do neither.

20.     YMTC respectfully asks this Court to put a stop to Defendants' illegal campaign and conspiracy of spreading misinformation about YMTC and YMTC's products through China Tech Threat and elsewhere and compensate YMTC for the harm caused by Defendants' lies.

## THE PARTIES

21.     Plaintiff Yangtze Memory Technologies Company, Ltd. ("YMTC Ltd.") is a leading developer and manufacturer of advanced 3D NAND flash memory and related storage technologies.  YMTC Ltd. is headquartered in Wuhan, China, and actively competes in the global semiconductor industry, including throughout the United States.  YMTC Ltd. pioneered and commercialized Xtacking® architecture, a disruptive technology that materially advanced memory chip performance and efficiency, positioning YMTC Ltd. as a direct competitive threat to incumbent industry participants, including Defendant Micron Technology, Inc.

22.     Plaintiff Yangtze Memory Technologies, Inc. ("YMT Inc.") is a wholly owned subsidiary of YMTC Ltd., incorporated under California law with its principal place of business at 2953 Bunker Hill Lane, Suite 206, Santa Clara, California 95054.  YMT Inc. manages YMTC's U.S. market entry, business development, and customer engagement activities.  YMT Inc. competed with Micron for major U.S. opportunities before Defendants' coordinated false advertising campaign impaired YMTC's commercial standing.

23.     Defendant DCI Group AZ, L.L.C. ("DCI") is an Arizona limited liability company with its principal place of business at 2000 K Street NW, Washington, D.C. 20006. DCI is a public affairs and strategic communications firm specializing in sophisticated "astroturfing" operations—covertly funded corporate advocacy disguised as grassroots or independent commentary.  DCI launders commercial messaging through fabricated organizations and deceptive online platforms to influence policy, markets, and public opinion while obscuring the identities of its corporate sponsors.  According to publicly available Arizona Corporations Commission records, all DCI members are citizens of states other than California or China.  *See* **Exhibit 5**.  Operating from its D.C. headquarters, DCI conceived, structured, managed, staffed, authored, and executed the campaign at issue, including launching and operating the "China

Tech Threat" website and affiliated media used to disseminate false statements about YMTC's products, business practices, and competitive position.

24.    Defendant Micron Technology, Inc. ("Micron") is a Delaware corporation with its principal place of business at 8000 South Federal Way, Boise, Idaho 83716.  Micron is a global manufacturer and supplier of memory and storage solutions, including 3D NAND flash memory, and is a direct and primary competitor of YMTC in the global marketplace.  On information and belief, in response to YMTC's rapid technological progress and increasing market share, Micron orchestrated, funded, and supervised the false advertising campaign alleged herein, targeting YMTC's reputation and commercial relationships in the United States.  On information and belief, Micron maintains a permanent office at 25 Massachusetts Avenue NW, Washington, D.C. 20001, from which it manages government engagement, strategic communications, competitive intelligence, and public affairs.  Micron's D.C. office collaborated with DCI's co-located operations to plan, fund, direct, and oversee the challenged campaign, using DCI as its agent and instrumentality to execute a coordinated effort to damage YMTC's competitive standing while shielding Micron's own direct involvement.

## JURISDICTION AND VENUE

25.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which creates a federal cause of action for injuries resulting from false or misleading representations in commercial advertising or promotion.

26.    Jurisdiction is also proper under 28 U.S.C. § 1332(a), as complete diversity of citizenship exists:  YMTC Ltd. is a citizen of China; YMT Inc. is a citizen of California; DCI is a citizen of Arizona (and the District of Columbia, where it maintains its principal place of business) whose members are not citizens of California or China; and Micron is a citizen of Delaware and Idaho.  The amount in controversy exceeds $75,000, exclusive of interest and costs, and Plaintiffs' damages are alleged to be in the millions of dollars.

27.    Defendant DCI is subject to general personal jurisdiction in this District under D.C. Code § 13-422, as it is headquartered and maintains its executive and operational nerve

center in Washington, D.C.  DCI is independently subject to specific personal jurisdiction under D.C. Code § 13-423(a)(1) and (a)(3) because the false advertising campaign was conceived, planned, managed, and executed from DCI's D.C. offices using D.C.-based personnel and infrastructure.  DCI transacted business in the District and committed the challenged acts within the District, and Plaintiffs' claims arise directly from these forum-related contacts.

28.    Defendant Micron is subject to personal jurisdiction in this District both through its systematic and continuous D.C. business activities and the specific forum-related conduct giving rise to this action.  On information and belief, Micron maintains a permanent Washington, D.C. office and staff, cultivates government relationships and commercial opportunities in the District, and competes directly for U.S. customers from its D.C. base.  On information and belief, Micron directed, funded, and oversaw the false advertising campaign through its D.C. office by hiring DCI to execute the campaign from DCI's D.C. headquarters.  The campaign targeted District-based policymakers, agencies, media organizations, and commercial decision-makers.  Micron's D.C.-based commercial activities are directly and causally linked to Plaintiffs' injuries.  Further, Micron is subject to conspiracy jurisdiction based on DCI's D.C. contacts because Micron and DCI acted in concert in the planning and execution of the campaign.  These facts satisfy D.C. Code § 13-423(a)(1) (transacting business) and (a)(4) (causing injury by acts outside the District while regularly conducting business within the District).

29.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because DCI resides here by virtue of its principal place of business in the District.  Venue is independently proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims—including the conception, planning, direction, and execution of the challenged advertising campaign—occurred in this District.  The District of Columbia was the operational center of the conspiracy, the site of key in-person meetings, and the locus of ongoing coordination, content creation, and dissemination.  The false advertising was directed at and amplified through District-based policymakers, agencies, and media, with the resulting harm to YMTC's reputation, business relationships, and market access concentrated in this forum.  No other district has a greater connection to the operative facts underlying this action.

## ALLEGATIONS COMMON TO ALL CLAIMS

### *YMTC Is Recognized As One Of The Most Innovative 3D NAND Memory Companies*

30.    YMTC is a fully integrated device manufacturer specializing in the design, development, and production of advanced memory products for global markets.  YMTC employs more than 7,400 professionals worldwide, including over 5,600 engineers, 1,700 research and development specialists, and more than 300 PhD-level experts, reflecting YMTC's sustained institutional commitment to technical innovation and excellence.

31.    YMTC's investment in 3D NAND flash memory technology has resulted in a series of major innovations.  YMTC has successfully designed and manufactured 3D NAND flash memory chips that set new benchmarks for bit density, input/output performance, and storage capacity.  These technical achievements have been consistently recognized by industry experts and analysts and earned widespread recognition throughout the semiconductor industry.

32.    YMTC's leadership is underscored by repeated honors from the Flash Memory Summit, the world's leading conference for flash memory and storage technologies.  The Summit, widely regarded as the premier global industry event, recognized YMTC in 2018 with the "Best of Show" award for "Most Innovative Flash Memory Start-up Company," describing YMTC as one of "the most creative and ambitious startup companies" and highlighting its potential to become "a market disruptor and champion of the storage industry."  In 2022, the Summit awarded YMTC's Xtacking® 3.0 3D NAND Architecture the "Most Innovative Memory Technology" award, further cementing its reputation for industry-leading innovation.

33.    Independent industry analysis further confirms YMTC's technological leadership.  TechInsights, a leading authority in semiconductor analysis, identified YMTC's 3D NAND chip as "the world's most advanced 3D NAND memory chip in a consumer device," featuring "the highest bit density seen in a commercially available NAND product."[5]

34.    As a result of its technological advancements, in 2022 YMTC was selected to supply its advanced memory chips to a leading global designer and manufacturer of consumer

---

[5]    *See China Does It Again: A NAND Memory Market First*, TechInsights, https://www.techinsights.com/blog/china-does-it-again-nand-memory-market-first.

computing products ("YMTC OEM Customer #1"), headquartered in the United States. Defendants were fully aware of this critical business relationship, including the customer's United States headquarters, the presence of YMTC's sales personnel in the United States, and the negotiation and performance of the agreement within the United States.

35.     Throughout this period, YMTC also maintained active commercial and technical discussions with other prospective customers and partners in the United States ("Prospective YMTC OEMs").  These sustained business activities underscore YMTC's substantial and continuous presence in the U.S. market—commercial opportunities that Defendants deliberately targeted and sought to disrupt.

### *Micron, Threatened By YMTC's Rise, Orchestrates A False Advertising Campaign*

36.     Defendant Micron is a global manufacturer and supplier of memory products for consumer and enterprise products, systems, and services, including 3D NAND.  Although Micron started developing 3D NAND before YMTC was founded in 2016, by 2022, industry publications recognized that YMTC was by then "the leader in 3D NAND flash," having "leap-frogged Micron."[6]  Industry insiders predicted that "YMTC would be the uncontested Flash technology leader before 2030," concluding that "[w]hat YMTC has accomplished has been nothing short of amazing."  *See id.*

59.     Micron, facing a direct challenge to its market share and profitability from YMTC's rapid ascent, resorted to a deceptive disinformation campaign rather than fair competition.  Instead of innovating and competing on the merits of its products, Micron sought to undermine YMTC's competitive standing through a sustained program of false and misleading advertising, product disparagement, and deceptive promotional activities.

37.     As reported by Bloomberg, Micron funded China Tech Threat—jointly run by its agents Defendant DCI and Strand Consult—to engage in advocacy "align[ed] with [its] corporate interests."  *See* Ex. 1 at 2.  Although China Tech Threat presented itself to the public and policymakers as an independent, objective research and advocacy organization focused on

---

[6]  *YMTC's Xtacking 3.0, First to 200+ Layers*, TechInsights (Nov. 11, 2022), https://www.techinsights.com/disruptive-event/ymtc-232l-tlc-3d-nand.

national security policy, Bloomberg's investigation established that CTT was, in fact, an "astroturfing" operation: a covert vehicle for disguising Micron's commercial messaging and self-interested attacks on competitors as grassroots advocacy or neutral policy analysis. *See* Ex. 1 at 2.

38.     Micron, in coordination with Defendant DCI and, on information and belief, other undisclosed actors, used the China Tech Threat platform to disseminate a barrage of false and misleading claims about YMTC and its products to the relevant purchasing public, policymakers, and media. This deceptive campaign involved disparaging YMTC to directly benefit Micron commercially. It also overtly promoted Micron as a preferable U.S.-based memory manufacturer and explicitly urged YMTC's customers and potential customers, including those in the United States, to abandon YMTC and favor Micron's products over YMTC's technologically superior offerings.

### The Structure And Mechanics Of Defendants' Deceptive Scheme

60.     Defendants executed a coordinated and deliberately concealed scheme to disseminate false and misleading information about YMTC across multiple channels—including the China Tech Threat website, policy briefs, press releases, and affiliated reports. This campaign began as early as 2020 and was managed by DCI, which secretly created, authored, and supplied content for CTT on Micron's behalf and under Micron's direction. For example, a July 13, 2021 CTT press release, which falsely alleged YMTC's ties to the Chinese military, was ostensibly authored by Roslyn Layton but was, in fact, drafted by DCI employees with funding from Micron. *See* **Exhibit 6** at 2.

39.     The non-partisan journalism website NOTUS corroborated these findings, reporting that "DCI Group employees were included in the metadata of the documents embedded on the [China Tech Threat] website over the past several years." Ex. 2 at 3. NOTUS also noted that some documents listing DCI employees as the author "have since been taken down [from the China Tech Threat website] and replaced with new documents without metadata, but the older versions have been captured by the Internet Archive's Wayback Machine." *Id.*

40.    The promotional materials that Defendant DCI authored include statements that mirror the false and misleading statements in the CTT Report.  For example, the report titled *Secure Equipment: The Whole of Government Effort to Restrict Dangerous Devices*, contains, without any supporting citation, that "YMTC chips can be enabled with kill switches which can cause a device and/or network shutdown."  *See* **Exhibit 7** at 5.  It further claims that vulnerabilities in these chips "could be exploited months or years later to disrupt or exfiltrate data from a system containing the compromised chip."  *See id.*  These unsubstantiated assertions mirror the CTT Report's false allegations of spyware and data exfiltration to Beijing.  *See* Ex. 4 at 11.  The latter statement is reprinted in the CTT Report ***verbatim***.

41.    On its face, the *Secure Equipment* report attributes authorship to China Tech Threat and provides no indication of Defendant DCI's involvement.  Nowhere in the visible text of the document is there any mention of DCI or its employees.  Only through forensic analysis of the document's metadata was YMTC able to uncover that DCI employee Emily Sullivan was its true author, as shown in the screenshot below:



42.     Micron and DCI actively concealed their roles in creating and disseminating the false statements about YMTC.  Despite reasonable diligence, YMTC did not have any reason to suspect Micron and DCI's involvement until Bloomberg published its report in January 2024, revealing for the first time that China Tech Threat was not a standalone organization but rather engaged in "astroturfing."  This fact was confirmed when the non-partisan journalism website NOTUS published its investigation in July 2024, uncovering that "at least five DCI Group employees were included in the metadata of the documents embedded on the [China Tech Threat] website over the past several years."

43.     Micron and DCI's concealment included: (a) operating behind China Tech Threat's facade while deliberately avoiding any public connection to the website or its content, (b) allowing China Tech Threat to present itself as an independent organization while secretly authoring its content, (c) attempting to destroy evidence of its involvement by removing metadata from documents on China Tech Threat's website after the Bloomberg and NOTUS articles exposed DCI's role, and (d) taking extraordinary measures to scrub documents containing metadata that would have revealed DCI's role in creating the false and misleading content.

44.     On information and belief, Defendants actively concealed Micron's funding and control of the China Tech Threat campaign.  Defendants' CTT Report and other publications did not disclose Micron's involvement or DCI's role in creating the content.  Defendants' intended this concealment to create the false impression of independent research and objective reporting.  Only through the independent investigative reporting by Bloomberg and NOTUS, followed by YMTC's forensic analysis of archived web content and metadata, was YMTC able to uncover the full extent of DCI's involvement in creating and disseminating the false statements.

45.     Defendants' scheme to create a "front" website surreptitiously backed by a YMTC competitor is an established DCI tactic.  The firm notoriously operated a seemingly independent website called Tech Central Station that voiced policy opinions.  In reality, DCI

operated the website to promote its corporate clients' goods, services, and commercial activities.[7] In an earlier report, *Bloomberg Businessweek* reported that a DCI unit maintains ties "with dozens of nonprofits and advocacy groups, regularly contributing money and then requesting their assistance on projects."[8]  One former DCI employee has stated that "staffers, policy experts, and even journalists were fed lines" by DCI.  *Id.*

### Defendants Spread Lies About YMTC And Its Products, Inuring To Micron's Benefit

46.    Operating through the CTT front group, Defendants published and widely disseminated a portfolio of falsehoods designed to manufacture a toxic narrative depicting YMTC as a national security threat.  The campaign maliciously and falsely linked YMTC's standard commercial memory products to military espionage, criminal conduct, and technically impossible malicious capabilities.

47.    For example, Defendants' publications baselessly asserted that "YMTC is associated with criminal activity, including a Social Security spoofing scam, identity theft, and cyber extortion," despite offering no credible evidence or reference to any legitimate law enforcement or investigative finding.  Similarly, on the CTT website, Defendants maintained a prominent section titled "China's Army to Infiltrate iPhones with YMTC Chips,"[9] relying on inflammatory language and visuals to falsely suggest that the mere use of YMTC chips in consumer devices constitutes a direct espionage threat.

---

[7]  *See* Nick Confessore, *How James Glassman reinvented journalism—as lobbying*, Wash. Monthly (Dec. 2, 2003), *available at* https://washingtonmonthly.com/2003/12/02/meet-the-press.

[8]  Zachary Mider & Ben Elgin, *How Hedge Funds (Secretly) Get Their Way in Washington*, Bloomberg Businessweek (Jan. 25, 2018), https://www.bloomberg.com/news/features/2018-01-25/how-hedge-funds-secretly-get-their-way-in-washington.

[9]  *See China's Army to Infiltrate iPhones with YMTC Chips*, China Tech Threat, https://chinatechthreat.com/chinas-army-to-infiltrate-iphones-with-ymtc-chips.



48.     The centerpiece of this disinformation campaign was the June 8, 2022, CTT Report, *Silicon Sellout: How Apple's Partnership with Chinese Military Chip Maker YMTC Threatens National Security* (the "CTT Report").  Ex. 4.  The CTT Report contains demonstrably false and misleading statements.  For example, it falsely states that "YMTC chips equipped with spyware and installed on Apple devices could funnel collected data back to Beijing."  Ex. 4 at 11.  It also falsely states that "built-in and concealed vulnerabilities" in YMTC chips could be "exploited months or years later to disrupt performance or exfiltrate data from a system containing the compromised chip."  *Id.* at 10.  Further, under the heading "Risk #1: National Security – The Battlefield Control Switch," the CTT Report misleadingly claims that YMTC chips could have a "kill switch" that "could be enabled or programmed to shut down remotely by an unauthorized Chinese government actor."  *Id.*  And it even deceptively claims that these purported vulnerabilities "would not be detected during manufacturing."  *Id.*  Remarkably, the only "support" that the report cites for this lie is a ***work of fiction*** titled "Ghost Fleet: A Novel of the Next World War."  *Id.*

49.     These statements are false and misleading.  YMTC designs and manufactures memory chips—arrays storing data (0s and 1s).  Memory chips, including YMTC's, lack the components for wireless transmission or remote control (antennas, modems, RF processors).

YMTC's NAND chips cannot execute code; they simply store data.  But the ordinary reader in the relevant audience, as well as YMTC's customers and potential customers, would understand these statements to mean that YMTC's memory chips are subject to remote control from China, capable of spying on American consumers, and designed to transmit user information to China. *See* Ex. 4 at 9, 10.  These statements disparage YMTC and its products, creating a false impression of national security risks and Chinese surveillance of the American public.  *Id.* at 4.

### Defendants Knew Their Statements Were False And Misleading

50.    Defendants knew, or at a minimum, acted with reckless disregard for the truth, that their statements about YMTC's products possessing spyware, kill switches, or other malicious data exfiltration capabilities were false and technically infeasible.

51.    Defendant Micron, as a leading global semiconductor manufacturer with decades of experience in memory chip technology, possesses deep and sophisticated technical expertise.  Micron unquestionably understands the fundamental architecture and limitations of NAND flash memory chips and knows that such chips cannot perform the espionage functions it falsely attributed to YMTC's products.

52.    Defendant DCI, which presents itself as a sophisticated public affairs and strategic communications firm with extensive experience working for technology and telecommunications companies (including Micron), likewise knew, or was willfully blind to, the technical impossibility of the claims it was manufacturing and disseminating.  DCI's role in crafting and promoting these falsehoods, despite the readily available technical facts, demonstrates a deliberate choice to deceive.

53.    The collective technical expertise of Micron and the sophistication of DCI render their coordinated dissemination of this false information particularly egregious.  They were not merely mistaken; they were either knowingly propagating lies or acting with a profound and reckless indifference to the truth for commercial gain.  The statements in the CTT Report and other CTT publications, given their technical absurdity, demonstrate, at the very least, a reckless disregard for the truth.

### The Commercial Nature And Intent of Defendants' Statements

54.     The CTT Report and other publications and statements that orchestrated by Micron and DCI were not good-faith contributions to public policy discourse but were instead commercial advertising and promotion designed to directly benefit Micron at YMTC's expense.

55.     Micron, as YMTC's principal competitor, was the direct beneficiary of these unlawful tactics.  In August 2022, Micron's CFO, Mark Murphy, acknowledged that YMTC had "made progress" and "got some engagements with customers now," stating this was a "concern for the NAND space."[10]  The CTT campaign—funded, directed, and orchestrated by Micron—sought to eliminate this competitive "concern" not through legitimate market conduct, but through a calculated campaign of falsehoods designed to remove YMTC from consideration and divert business to Micron.

56.     The CTT Report, "Silicon Sellout," explicitly and repeatedly promoted Micron as a preferred, American alternative to YMTC.  For example, the report highlights "Idaho-based Micron" as the "only American company" leading in memory manufacturing and directly implores Apple to "source its chips from existing suppliers like Micron" or "source memory chips from non-Chinese chipmakers like Micron."  Ex. 4 at 4, 8, 14.  These are unambiguous commercial solicitations aimed at influencing purchasing decisions away from YMTC and towards Micron.

57.     Micron's objective in funding and directing this campaign through DCI and China Tech Threat was to eliminate or severely cripple YMTC as a competitor in the lucrative 3D NAND flash memory market, thereby protecting and enhancing Micron's own market share and profitability.  The principal objective of the Defendants' campaign was to directly disrupt YMTC's commercial relationships and dissuade existing and potential customers from transacting with YMTC.  This was not primarily an effort to shape public policy; rather, it was a targeted attack on a business rival.  The CTT Report's overt commercial solicitation and its

---

[10]   Alan Patterson, *Micron's Mixed CapEx Plans Square Up, Analyst Says*, EE Times (Aug. 17, 2022), https://www.eetimes.com/microns-mixed-capex-plans-square-up-analyst-says/.

direct address to specific companies underscore the anti-competitive intent and market-distorting purpose of Defendants' conduct.

### Defendants' Unlawful Conduct Has Significantly Harmed YMTC

58.    Although advocacy on behalf of a corporation is not per se unlawful, Defendants' conduct far exceeded permissible bounds.  Defendants executed a coordinated campaign of false advertising, intentionally designed to injure YMTC's business and to confer unlawful competitive advantages on Micron.  Purporting to operate as independent actors, Defendants systematically disseminated false, deceptive, and misleading statements about YMTC and its products, targeting YMTC's customers and commercial partners to promote Micron's interests.

59.     The campaign's principal objective was to disrupt YMTC's commercial relationships and dissuade existing and potential customers from transacting with YMTC, rather than to shape public policy.  The CTT Report—a core instrumentality of the scheme—explicitly directed U.S. companies to terminate business with YMTC and to source memory chips from non-Chinese suppliers, including Micron.  Ex. 4 at 14.  This overt commercial solicitation underscores the anti-competitive intent and market-distorting effects of Defendants' conduct.

60.    Defendants' false and misleading statements caused YMTC to lose significant business opportunities and derailed ongoing negotiations with major customers and technical partners.  These disruptions resulted in the loss of millions of dollars in sales to leading computer and consumer electronics manufacturers in the United States and abroad.  The campaign damaged YMTC's business relationships and materially impaired its market standing in the United States.  Defendants' conduct severely harmed the reputation and goodwill of YMTC and its U.S. subsidiary, causing deterioration in relationships with key customers and partners.  Ex. 4 at 4, 14.

61.    For example, YMTC lost business with a leading original equipment manufacturer ("OEM Customer #1").  YMTC had completed this OEM's qualification processes and was positioned to supply advanced 3D NAND flash memory chips for flagship products.  Industry data confirmed YMTC's pricing was approximately 20% below competitors, and OEM Customer #1 was considering sourcing up to 40% of its global NAND requirements from

YMTC.  After Defendants intensified their disinformation campaign in mid-2022—specifically targeting this relationship with fabricated security allegations—OEM Customer #1 suspended and ultimately abandoned plans to use YMTC chips as of October 2022.  This single lost opportunity alone accounted for hundreds of millions of dollars in lost revenue.

62.    As a direct and foreseeable result, YMTC has suffered substantial financial harm, including lost sales, forfeited market opportunities, and increased mitigation costs.  The magnitude of the harm compelled YMTC to implement a 10% reduction in workforce in early 2023.  Beyond immediate financial injury, Defendants' conduct has inflicted lasting damage on YMTC's reputation and commercial standing across the technology sector.  The campaign's false narrative portraying YMTC as an untrustworthy and criminally-linked enterprise generated widespread suspicion among market participants, materially impairing YMTC's ability to compete on the merits worldwide.

## FIRST CLAIM FOR RELIEF

**(False Advertising, Product Disparagement, and Unfair Competition in Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a))**

**(Directly Against Defendants Micron and DCI)**

63.    YMTC repeats and realleges paragraphs 1 through 62 above as if set forth herein.

64.    Defendants engaged in an extensive, coordinated, and commercial campaign of false advertising and product disparagement specifically targeting YMTC and its 3D NAND flash memory products.  This campaign involved the dissemination of false and misleading statements in interstate trade or commerce through various channels and mediums, including through the China Tech Threat website, articles published on China Tech Threat and elsewhere, press releases distributed to media outlets and industry publications, social media posts on platforms such as Twitter and LinkedIn, presentations at industry conferences and events, and direct communications with YMTC's existing and prospective customers.

65.    This "astroturfing" disinformation campaign, orchestrated for the benefit of Micron, YMTC's direct competitor in the 3D NAND flash memory market, was designed to undermine YMTC's competitive standing and divert sales to Micron.  Defendants' unlawful

conduct was: (a) commercial in nature, promoting Micron's competing 3D NAND flash memory products while disparaging YMTC's; (b) designed to influence purchasing decisions of OEMs, businesses incorporating memory chips, and ultimate consumers by diverting sales from YMTC to Micron; and (c) disseminated broadly to the relevant purchasing public through the above-mentioned channels, ensuring wide exposure to the false and misleading claims.

66.    As part of this campaign, Defendants made demonstrably false and misleading statements of fact in their commercial advertising and promotion.  These statements were intended to exploit xenophobic anxieties and prejudice against YMTC to benefit Micron, a U.S.-based company.  These statements, some of which were literally false and others misleading though literally true, included, among others:

(a)    The false and/or misleading statement: "YMTC is associated with criminal activity, including a Social Security spoofing scam, identity theft, and cyber extortion," published by Defendants on January 4, 2021, on the China Tech Threat website.  Ex. 3.

(b)    The false and/or misleading statement: "YMTC chips equipped with spyware and installed on Apple devices could funnel collected data back to Beijing," published by Defendants on June 8, 2022, in the CTT Report.  Ex. 4.

(c)    The false and/or misleading statement: "YMTC chips… present the possibility that malicious technology… from the Chinese military could be introduced to Apple end-users," published by Defendants on June 8, 2022, in the CTT Report.  Ex. 4.

(d)    The false and/or misleading statement: "YMTC chips could be… intentionally compromised with rogue features… These built-in and concealed vulnerabilities would not be detected during manufacturing.  They could be exploited … to disrupt performance or exfiltrate data," published by Defendants on June 8, 2022, in the CTT Report.  Ex. 4.

(e)    The false and/or misleading statement: "Electronics with embedded chips are enabled with a 'kill switch'… Such features, under Chinese military production, could be enabled… to shut down remotely by an unauthorized Chinese government actor," published by Defendants on June 8, 2022, in the CTT Report.  Ex. 4.  Defendants'

statement misleadingly suggested that YMTC's memory chips could execute code and activate a "kill switch" in devices.  This is false because YMTC's memory chips, unlike microprocessors, do not execute code.  Defendants further fueled this misconception by citing an article about cyberattacks on military hardware involving microprocessors, using the term "chip" to imply that YMTC's products could similarly be compromised.

67.    These and other false and misleading statements, disseminated through the channels described above, falsely portrayed YMTC and its products as: (a) posing national security risks; (b) containing spyware and "kill switches"; (c) being vulnerable to manipulation by the Chinese government; and (d) being associated with criminal activity.  These representations were either literally false or, though literally true, misleading due to omissions and implications.

68.    Defendants knew, or recklessly disregarded, the falsity or misleading nature of these statements.  They further compounded the deception by concealing Micron's funding and direction of the disinformation campaign, creating a false impression of objectivity and independent analysis, when in reality, the China Tech Threat publications and statements constituted coordinated and paid-for commercial advertising and promotion by DCI for Micron.

69.    These statements deceived, or had the tendency to deceive, a substantial segment of the relevant purchasing public, or those making purchasing decisions, including YMTC's customers and prospective customers, OEMs, businesses, and consumer end-users, who rely on or likely will rely on accurate information about technology products when making purchasing decisions.  Defendants knew, or reasonably should have known, that their statements were false or misleading and intended to deceive these audiences into believing that YMTC and its products posed a security risk, were inferior in quality to Micron's products, or were otherwise undesirable.

70.    The deceptive statements were material and likely to influence purchasing decisions.  Consumers and businesses, particularly in the technology sector, are sensitive to national security concerns and the potential for data breaches and cyberattacks.  The false and misleading claims of spyware, Chinese government control, and criminal activity that

Defendants disseminated were designed to exploit these sensitivities and cause deception among the relevant purchasing public. This deception directly influenced and were likely to influence the purchasing decisions of these audiences, causing them to refrain from purchasing products with YMTC chips and from doing business with YMTC, thereby directly and foreseeably harming YMTC's sales, revenue, and market share.

71.    As a direct and proximate result of Defendants' false and misleading advertising and promotion, YMTC suffered substantial injury, including harm to YMTC's reputation and goodwill, resulting in lost sales, revenue, opportunities, and market share, as well as expenses incurred to mitigate the harm caused by Defendants' false statements. Defendants' false statements also directly harmed YMTC's reputation and goodwill within the industry and among consumers, making it more difficult for YMTC to compete effectively in the market, attract and retain customers, secure investments, and recruit and retain employees. Defendants' conduct was a substantial factor in causing these harms to YMTC. Micron, as YMTC's direct competitor in the relevant market, directly and proximately benefited from this harm by capturing market share, sales, and/or revenue that otherwise would have gone to YMTC.

72.    Defendants' conduct constitutes false advertising and unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a).

73.    YMTC is entitled to recover from Defendants all damages directly and proximately caused by Defendants' unlawful conduct in an amount to be determined at trial, including for actual damages, lost profits, damages to reputation and goodwill, corrective advertising costs, and disgorgement of Defendants' profits attributable to false advertising. YMTC also seeks prejudgment interest, costs, and attorneys' fees in accordance with governing law, especially given the exceptional nature of Defendants' unlawful conduct.

74.    YMTC also has no adequate remedy at law and therefore seeks injunctive relief to prevent Defendants from repeating or republishing these false and misleading statements, as well as corrective advertising to mitigate the harm caused by Defendants' unlawful conduct.

## SECOND CLAIM FOR RELIEF

**(False Advertising, Product Disparagement, and Unfair Competition in Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a))**

**(Contributorily Against Defendants Micron and DCI)**

75.     YMTC repeats and realleges paragraphs 1 through 62 above as if set forth herein.

76.     Defendants Micron and DCI are contributorily liable for the false advertising and unfair competition described herein.  Micron, by knowingly funding, directing, and instigating the false advertising campaign, and DCI, by knowingly creating, managing, and disseminating the false advertising campaign through the China Tech Threat platform at Micron's direction, both materially contributed to the primary violations of the Lanham Act.

77.     Defendant Micron, with actual or constructive knowledge of the false and misleading nature of the statements being disseminated about YMTC and its products, and with the unlawful purpose of harming YMTC and benefiting itself commercially, intentionally induced and materially contributed to the false advertising campaign by, inter alia: (a) providing the funding for the CTT platform and its associated activities; (b) directing Defendant DCI to create and disseminate false and misleading statements about YMTC; and (c) orchestrating the overall strategy of the astroturfing campaign designed to deceive the relevant purchasing public.

78.     Defendant DCI, with actual or constructive knowledge that the statements it was creating and disseminating were false and misleading, and that they were part of an unlawful false advertising campaign, supplied essential services and instrumentalities to the CTT platform. These services were provided for the purpose of disseminating false and misleading statements regarding YMTC and its products in interstate and international commerce for Micron's commercial advantage, including statements such as: (a) that YMTC was linked to "criminal activity, including a Social Security spoofing scam, identity theft and cyber extortion"; (b) that "YMTC chips equipped with spyware and installed on Apple devices could funnel collected data back to Beijing" and could be used to "exfiltrate data"; (c) that YMTC chips can be "enabled with kill switches which can cause a device and/or network shutdown"; (d) that YMTC chips could contain undisclosed vulnerabilities exploitable by the Chinese government or military that

24

would not be detected during manufacturing; and (e) implying that YMTC chips facilitate Chinese military infiltration of consumer electronic devices.

79.     These essential services and instrumentalities provided by DCI included, but were not limited to, campaign strategy development, content creation (including DCI employees authoring or causing the authoring of the aforementioned false statements published by CTT), website operation and management for the CTT platform, and media outreach and dissemination efforts, all of which were managed and executed from DCI's Washington, D.C. offices.

80.     The false and misleading statements of fact for which Defendants Micron and DCI are contributorily liable, by inducing, funding, directing, creating, and/or disseminating them, include, among others:

(a)     The false and/or misleading statement: "YMTC is associated with criminal activity, including a Social Security spoofing scam, identity theft, and cyber extortion," published by Defendants on January 4, 2021, on the China Tech Threat website.  Ex. 3.

(b)     The false and/or misleading statement: "YMTC chips equipped with spyware and installed on Apple devices could funnel collected data back to Beijing," published by Defendants on June 8, 2022, in the CTT Report.  Ex. 4.

(c)     The false and/or misleading statement: "YMTC chips… present the possibility that malicious technology… from the Chinese military could be introduced to Apple end-users," published by Defendants on June 8, 2022, in the CTT Report.  Ex. 4.

(d)     The false and/or misleading statement: "YMTC chips could be… intentionally compromised with rogue features… These built-in and concealed vulnerabilities would not be detected during manufacturing.  They could be exploited … to disrupt performance or exfiltrate data," published by Defendants on June 8, 2022, in the CTT Report.  Ex. 4.

(e)     The false and/or misleading statement: "Electronics with embedded chips are enabled with a 'kill switch'… Such features, under Chinese military production, could be enabled… to shut down remotely by an unauthorized Chinese government actor," published by Defendants on June 8, 2022, in the CTT Report.  Ex. 4.  Defendants'

statement misleadingly suggested that YMTC's memory chips could execute code and activate a "kill switch" in devices. This is false because YMTC's memory chips, unlike microprocessors, do not execute code. Defendants further fueled this misconception by citing an article about cyberattacks on military hardware involving microprocessors, using the term "chip" to imply that YMTC's products could similarly be compromised.

81.     Defendant Micron knew or had reason to know that by funding and directing DCI and the CTT platform to disseminate such false and misleading statements, it was inducing and materially contributing to violations of the Lanham Act. Defendant DCI knew or had reason to know that by creating, managing, and disseminating such false and misleading statements through the CTT platform, it was materially contributing to violations of the Lanham Act. Both Defendants actively concealed Micron's funding and direction of the campaign and DCI's authorship, thereby enhancing the deceptive impact of the false advertising.

82.     The false and misleading statements, to which Micron and DCI contributorily caused or induced, deceived, or had the tendency to deceive, a substantial segment of the relevant purchasing public, or those making purchasing decisions, including YMTC's customers and prospective customers, OEMs, businesses, and consumer end-users, who rely on accurate information about technology products when making purchasing decisions. Defendants knew, or reasonably should have known, that their statements were false or misleading and intended to deceive these audiences into believing that YMTC and its products posed a security risk, were inferior in quality to Micron's products, or were otherwise undesirable.

83.     The deceptive statements were material and likely to influence purchasing decisions. Consumers and businesses, particularly in the technology sector, are sensitive to national security concerns and the potential for data breaches and cyberattacks. The false and misleading claims of spyware, Chinese government control, and criminal activity that Defendants disseminated were designed to exploit these sensitivities and cause deception among the relevant purchasing public. This deception directly influenced the purchasing decisions of these audiences, causing them to refrain from purchasing products with YMTC chips and from

doing business with YMTC, thereby directly and foreseeably harming YMTC's sales, revenue, and market share.

84.     As a direct and proximate result of Defendants Micron's and DCI's knowing and material contributions to, and inducement of, the false advertising campaign, including the creation, funding, direction, and dissemination of false statements such as those detailed above, YMTC has suffered substantial injury.  This includes harm to YMTC's reputation and goodwill, resulting in lost sales, revenue, opportunities, and market share, as well as expenses incurred to mitigate the harm caused by Defendants' false statements.  Defendants' false statements also directly harmed YMTC's reputation and goodwill within the industry and among consumers, making it more difficult for YMTC to compete effectively in the market, attract and retain customers, secure investments, and recruit and retain employees.  Defendants' conduct was a substantial factor in causing these harms to YMTC.  Defendant Micron, as YMTC's direct competitor in the relevant market, directly and proximately benefited from this harm by capturing market share, sales, and/or revenue that otherwise would have gone to YMTC.

85.     Defendants caused the false statements to enter interstate commerce by way of China Tech Threat's website and other platforms in and affecting interstate commerce. Defendants' conduct constitutes false advertising, product disparagement, and unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a).

86.     YMTC is entitled to recover from Defendants Micron and DCI, jointly and severally, all damages directly and proximately caused by their unlawful contributory conduct, in an amount to be determined at trial, including but not limited to actual damages, lost profits, damages for injury to reputation and goodwill, costs of corrective advertising, and disgorgement of Defendants' profits attributable to their contributory false advertising.  YMTC also seeks prejudgment interest, costs of suit, and reasonable attorneys' fees in accordance with governing law, particularly given the willful and exceptional nature of Defendants' unlawful conduct.

87.     YMTC has no adequate remedy at law for the ongoing and future harm threatened by Defendants' contributory conduct.  Therefore, YMTC seeks permanent injunctive relief to prevent Defendants Micron and DCI, and all those acting in concert with them, from continuing

to induce, fund, direct, create, or disseminate these or any other false and misleading statements about YMTC or its products.  YMTC also seeks an order requiring Defendants to issue corrective advertising sufficient to mitigate the harm caused by their unlawful contributory conduct.

## PRAYER FOR RELIEF

WHEREFORE, YMTC respectfully requests that the Court render the following relief:

1.      Grant judgment in favor of YMTC and against each Defendant;

2.      Grant all appropriate injunctive relief, including corrective advertising;

3.      Award YMTC an appropriate amount in monetary damages against Defendants as determined at trial, including general, compensatory, special, and treble damages, and including pre-judgment interest, in accordance with applicable law;

4.      Award YMTC disgorgement of Defendants' profits; and

5.      Grant YMTC such other relief as is just and appropriate, including attorneys' fees and costs.

Dated:  June 6, 2025                    QUINN EMANUEL URQUHART &
                                        SULLIVAN LLP


By   */s/ Robert M. Schwartz*
    Robert M. Schwartz (D.C. Bar 412049)
    robertschwartz@quinnemanuel.com
    Aaron Perahia (*pro hac vice to be filed*)
    aaronperahia@quinnemanuel.com
    865 S. Figueroa St., 10th Floor
    Los Angeles, California 90017
    Telephone: (213) 443-3000
    Facsimile:  (213) 443-3100

    David E. Eiseman (D.C. Bar 1015590)
    davideiseman@quinnemanuel.com
    50 California Street, 22nd Floor
    San Francisco, California 94111-4788
    Telephone: (415) 875-6600
    Facsimile:  (415) 875-6700

    David Needham (D.C. Bar 1017372)
    davidneedham@quinnemanuel.com
    1300 I Street NW
    Washington, DC 20005
    Telephone: (202) 538-8000
    Facsimile:  (202) 538-8100

    Evan Pearson (*pro hac vice to be filed*)
    evanpearson@quinnemanuel.com
    300 West Sixth Street, Suite 2010
    Austin, Texas 78701-3901
    Telephone: (737) 667-6100
    Facsimile:  (737) 667-6200

    Hayden Little (*pro hac vice to be filed*)
    haydenlittle@quinnemanuel.com
    700 Louisiana Street, Suite 3900
    Houston, Texas 77002-2841
    Telephone: (713) 221-7000
    Facsimile:  (713) 221-7100

    *Attorneys for Plaintiffs Yangtze Memory*
    *Technologies Company, Ltd. and Yangtze*
    *Memory Technologies, Inc.*

## <u>DEMAND FOR JURY TRIAL</u>

YMTC hereby demands a trial by jury.

Dated:  June 6, 2025                    QUINN EMANUEL URQUHART &
                                               SULLIVAN LLP


By   */s/ Robert M. Schwartz*
     Robert M. Schwartz (D.C. Bar 412049)
     robertschwartz@quinnemanuel.com
     865 S. Figueroa St., 10th Floor
     Los Angeles, California 90017
     Telephone: (213) 443-3000
     Facsimile: (213) 443-3100

     *Attorneys for Plaintiffs Yangtze Memory*
     *Technologies Company, Ltd. and Yangtze*
     *Memory Technologies, Inc.*