**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| YANGTZE MEMORY TECHNOLOGIES, INC., and YANGTZE MEMORY TECHNOLOGIES CO., LTD., <br><br> Plaintiffs, <br><br> v. <br><br> MICRON TECHNOLOGY, INC. And DCI GROUP AZ, L.L.C., <br><br> Defendants. | No. 25-cv-1795-CJN <br><br> Hon. Carl J. Nichols |

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT MICRON TECHNOLOGY, INC.'S MOTION TO DISMISS**</u>

TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................1

BACKGROUND ....................................................................................................3

    A.    The Controversy Surrounding Importation of YMTC Product ...................5

    B.    China Tech Threat's Political Advocacy .......................................................5

    C.    YMTC Resorts to Litigation to Stifle Its Critics.........................................8

        1. YMTC Sues Without Success in the Northern District of

           California ..............................................................................................8

        2. Stymied in the Northern District of California, YMTC Brings the Same

           Claims in this Court .............................................................................9

        3. YMTC Seeks to Transfer the Northern District of

           California  Case to This Court .............................................................11

LEGAL STANDARD............................................................................................11

ARGUMENT.........................................................................................................12

    A.    CTT's Political Advocacy Is Not Advertising Subject to the

        Lanham Act ................................................................................................12

    B.    CTT's Political Advocacy Is Protected by the Noerr

        Pennington Doctrine...................................................................................19

TABLE OF CONTENTS (cont.)

Page

C.  The Complaint Does Not Plead Facts Showing CTT's Statements Are Objectively False or Misled the Target Audience.............................................................................23

1. The Four Statements in the 2022 CTT Report Are Neither Statements of Verifiable Fact Nor Misleading....................................24

2. The 2021 Article Is Not Connected to Any Damages Identified by YMTC..........................................................................29

D.  The Complaint Should Be Dismissed with Prejudice................................31

CONCLUSION.................................................................................................33

<u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

Cases

*Abrahams v. Simplify Compliance, LLC*,
　2021 WL 1197732 (D.D.C. Mar. 30, 2021) ................................................................. 30

*Agency Dev., Inc. v. Medamerica Ins. Co. of New York*,
　142 F. App'x 545 (2d Cir. 2005) ............................................................................... 32

*AirHawk Int'l, LLC v. TheRealCraigJ, LLC*,
　2017 WL 3891214 (C.D. Cal. Jan. 19, 2017) ........................................................... 23

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
　486 U.S. 492 (1988) .................................................................................................. 22

*ALPO Petfoods, Inc. v. Ralston Purina Co.*,
　913 F.2d 958 (D.C. Cir. 1990) .................................................................................. 29

*Am. Hosp. Ass'n v. Azar*,
　468 F. Supp. 3d 372 (D.D.C. 2020) .......................................................................... 15

*Am. President Lines, LLC v. Matson, Inc.*,
　633 F. Supp. 3d 209 (D.D.C. 2022) .......................................................................... 19

*Anthony v. Int'l Ass'n of Machinists & Aerospace Workers Dist. Lodge,
　1*, 296 F. Supp. 3d 92 (D.D.C. 2017) ....................................................................... 11

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009) .................................................................................................. 11

*Atchison v. U.S. Dist. Cts.*,
　190 F. Supp. 3d 78 (D.D.C. 2016) .............................................................................. 2

*Azurity Pharms., Inc. v. Edge Pharma, LLC*,
　45 F.4th 479 (1st Cir. 2022) ..................................................................................... 29

*Barnes Found. v. Twp. of Lower Merion*,
　242 F.3d 151 (3d Cir. 2001) ..................................................................................... 20

*Barrett v. Atl. Monthly Grp. LLC*,
　2024 WL 4119400 (D.D.C. Sept. 9, 2024) ............................................................... 31

*Bell Atl. Corp. v. Twombly*,
　550 U.S. 544 (2007) .................................................................................................. 11

<u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

*Black Diamond Land Mgmt. LLC v. Twin Pines Coal Inc.*,
   707 F. App'x 576 (11th Cir. 2017) ................................................................................... 30

*Bolger v. Youngs Drug Prods. Corp.*,
   463 U.S. 60 (1983) ........................................................................................................ 15, 18

*Bosley Med. Inst., Inc. v. Kremer*,
   403 F.3d 672 (9th Cir. 2005) .......................................................................................... 12

*Bristol-Myers Squibb Co. v. Immunex Corp.*,
   84 F. Supp. 2d 574 (D.N.J. 2000) .................................................................................. 32

*California Motor Transport Co. v. Trucking Unlimited*,
   404 U.S. 508 (1972) ........................................................................................................ 22

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
   447 U.S. 557 (1980) ........................................................................................................ 15

*Children's Health Def. v. Meta Platforms, Inc.*,
   112 F.4th 742 (9th Cir. 2024) ......................................................................................... 11

*Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*,
   447 U.S. 530 (1980) ........................................................................................................ 18

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*,
   406 F. Supp. 3d 1258 (M.D. Ala. 2019) .............................................................. 13, 14, 17, 18

*Covad Commc'ns Co. v. Bell Atl. Corp.*,
   398 F.3d 666 (D.C. Cir. 2005) ....................................................................................... 19

*Crash Proof Ret., LLC v. Price*,
   533 F. Supp. 3d 227 (E.D. Pa. 2021) ............................................................................. 19

*E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961) ........................................................................................ 19, 20, 21, 22

*Edward Lewis Tobinick, MD v. Novella*,
   848 F.3d 935 (11th Cir. 2017) ........................................................................................ 16

*Evanger's Dog & Cat Food Co, Inc. v. Env't Democracy Project*,
   2022 WL 180205 (C.D. Cal. Jan. 20, 2022) .................................................................. 32

TABLE OF AUTHORITIES

Page(s)

*Farah v. Esquire Mag.*,
 736 F.3d 528 (D.C. Cir. 2013) ...................................................................................... passim

*Farah v. Esquire Mag., Inc.*,
 863 F. Supp. 2d 29 (D.D.C. 2012) ................................................................................ passim

*FedEx Ground Package Sys., Inc. v. Route Consultant, Inc.*,
 97 F.4th 444 (6th Cir. 2024) ...................................................................................... 24, 28

*Feld Entertainment Inc. v. A.S.P.C.A.*,
 873 F. Supp. 2d 288 (D.D.C. 2012) .................................................................................. 23

*Fernandez v. Jones*,
 653 F. Supp. 2d 22 (D.D.C. 2009) ................................................................................ 3, 23

*FilmTec Corp. v. Hydranautics*,
 67 F.3d 931 (Fed. Cir. 1995) ............................................................................................ 32

*Firestone v. Firestone*,
 76 F.3d 1205 (D.C. Cir. 1996) .......................................................................................... 31

*G.U.E. Tech, LLC v. Panasonic Avionics Corp.*,
 2016 WL 6138422 (C.D. Cal. Feb. 4, 2016) ..................................................................... 32

*Groden v. Random House, Inc.*,
 61 F.3d 1045 (2d Cir. 1995) ................................................................................................ 2

*Hamilton Exhibition, LLC v. Imagine Exhibitions, Inc.*,
 2019 WL 2590639 (S.D.N.Y. June 11, 2019) ................................................................... 25

*Havoco of Am., Ltd. v. Hollobow*,
 702 F.2d 643 (7th Cir. 1983) ............................................................................................ 20

*I Dig Texas, LLC v. Creager*,
 98 F.4th 998 (10th Cir. 2024) ........................................................................................... 27

*In re Century 21-RE/MAX Real Est. Advert. Claims Litig.*,
 882 F. Supp. 915 (C.D. Cal. 1994) ................................................................................... 31

*Jefferies v. D.C.*,
 916 F. Supp. 2d 42 (D.D.C. 2013) ............................................................................... 31, 32

TABLE OF AUTHORITIES

Page(s)

*Jefferson-11th St., LLC v. D.C.*,
  2020 WL 3035038 (D.D.C. June 5, 2020).................................................................. 21

*Jones v. Louisiana State Bar Ass'n*,
  738 F. Supp. 2d 74 (D.D.C. 2010) ........................................................................ 19

*Kaempe v. Myers*,
  367 F.3d 958 (D.C. Cir. 2004) ................................................................................ 4

*Keel v. Axelrod*,
  148 F. Supp. 3d 411 (E.D. Pa. 2015) ..................................................................... 18

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014).............................................................................................. 24, 30

*McIntyre v. Ohio Elections Comm'n*,
  514 U.S. 334 (1995)................................................................................................. 1

*MiMedx Grp., Inc. v. DBW Partners LLC*,
  2018 WL 4681005 (D.D.C. Sept. 28, 2018) .............................................................. 3

*Nader v. Democratic Nat'l Comm.*,
  567 F.3d 692 (D.C. Cir. 2009) ................................................................................ 3

*Nader v. The Democratic Nat'l Comm.*,
  555 F. Supp. 2d 137 (D.D.C. 2008)..................................................................... 3, 19

*New York Times Co. v. Sullivan*,
  376 U.S. 254, (1964)............................................................................................... 17

*Nichols v. Club for Growth Action*,
  235 F. Supp. 3d 289 (D.D.C. 2017) ....................................................................... 14

*Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*,
  2015 WL 13691543 n.4 (D.D.C. Feb. 3, 2015) ....................................................... 31

*Picket Fence Preview, Inc. v. Zillow, Inc.*,
  2023 WL 4852971 (2d Cir. July 31, 2023)......................................................... 24, 28

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*,
  227 F.3d 489 (5th Cir. 2000) ................................................................................. 23

## TABLE OF AUTHORITIES

Page(s)

*Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*,
    784 F.2d 674 (5th Cir. 1986) ................................................................................................ 25

*Radiance Found., Inc. v. N.A.A.C.P.*,
    786 F.3d 316 (4th Cir. 2015) ................................................................................................ 16

*Regal W. Corp. v. Nguyen*,
    412 F. Supp. 3d 1305 (W.D. Wash. 2019) ............................................................................ 31

*Samuel v. Wells Fargo & Co.*,
    311 F. Supp. 3d 10 (D.D.C. 2018) ........................................................................................ 31

*Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.*,
    902 F.2d 222 (3d Cir. 1990) ................................................................................................. 25

*Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*,
    249 F. Supp. 2d 463 (M.D. Pa. 2003) .................................................................................. 21

*Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*,
    586 F.3d 500 (7th Cir. 2009) ............................................................................................... 25

*Seven-Up Co. v. Coca-Cola Co.*,
    86 F.3d 1379 (5th Cir. 1996) ............................................................................................... 13

*Sientra, Inc. v. NewMedical Tech., Inc*,
    2019 WL 1460616 (C.D. Cal. Feb. 28, 2019) ...................................................................... 27

*Sliding Door Co. v. KLS Doors, LLC*,
    2013 WL 2090298 (C.D. Cal. May 1, 2013) ........................................................................ 20

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) ............................................................................................... 20

*Taubman Co. v. Webfeats*,
    319 F.3d 770 (6th Cir. 2003) ............................................................................................... 13

*UCP Int'l Co. Ltd. v. Balsam Brands Inc.*,
    420 F. Supp. 3d 966 (N.D. Cal. 2019) ................................................................................. 21

*United Mine Workers of Am. v. Pennington*,
    381 U.S. 657 (1965) .............................................................................................................. 20

## TABLE OF AUTHORITIES

Page(s)

*United States v. Philip Morris USA Inc.*,
   566 F.3d 1095 (D.C. Cir. 2009) ........................................................................... 14

*Wysong Corp. v. APN, Inc.*,
   889 F.3d 267 (6th Cir. 2018) ............................................................................... 26

Statutes

15 U.S.C. § 1051 ................................................................................................... 12

15 U.S.C. § 1125(a) ..................................................................................... 9, 12, 13

Pub. L. 117-263, 136 Stat. 2395, § 5949 ................................................................ 5

U.S. CONST amend. I ....................................................................................... 2, 19

Rules

Fed. R. Evid. 201(b)(2) ........................................................................................... 4

Federal Rule of Civil Procedure 8 ........................................................................ 31

Federal Rule of Civil Procedure 9(b) .................................................................... 31

Regulations

15 C.F.R. Pt. 744, Supp. 4 ....................................................................................... 5

87 Fed. Reg. 77505-01 ............................................................................................ 5

89 Fed. Reg. 36738-01 ............................................................................................ 5

Other Authorities

168 Cong. Rec. H8877-01 ....................................................................................... 4

H9234 ..................................................................................................................... 4

Defendant Micron Technology, Inc. ("Micron"), respectfully submits this Memorandum of points and authorities in support of its Motion to Dismiss the complaint brought against it and co-defendant, DCI Group AZ, L.L.C. ("DCI", and together with Micron, "Defendants"), by plaintiffs, Yangtze Memory Technologies, Inc., and Yangtze Memory Technologies Co., Ltd. (together, "YMTC").

## INTRODUCTION

The law is not a tool to stifle political advocacy. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) ("The advocacy of a politically controversial viewpoint . . . is the essence of First Amendment expression."). This case concerns just such advocacy. In two pieces published in 2021 and 2022, China Tech Threat ("CTT") called for the President, Congress, and various federal agencies to take action against YMTC because its products threaten America's national security and economy. YMTC argues that CTT's claims are false and alleges that Defendants are behind them. Even if that were so, it would not permit this case to proceed. Neither the statute upon which YMTC relies nor the Constitution allows YMTC to suppress political advocacy urging that "US policymakers must restrict technology exports to and imports from YMTC." Ex. 4 at 2.[1]

*First*, because CTT's works are political advocacy and not commercial advertising, they cannot constitute false advertising under the Lanham Act. YMTC tries to fit a square peg into a round hole by pleading *false advertising claims* to penalize *political statements*. YMTC incorporated the CTT articles in its complaint, meaning they are before the Court on a motion to

---

[1] "Ex." refers to the exhibits attached to the Complaint.

dismiss. *See Atchison v. U.S. Dist. Cts.*, 190 F. Supp. 3d 78, 93 (D.D.C. 2016) ("[I]n deciding a Rule 12(b)(6) motion" courts may consider "documents attached as exhibits or incorporated by reference in the complaint."). And they are obviously not advertising. CTT's works typify the sort of policy pieces commonly written to urge the government to adopt particular positions in legislation, regulation, and executive action. That renders the Lanham Act's false advertising provisions inapplicable, because "[e]very circuit court of appeals to address the scope of these provisions has held that they apply only to commercial speech." *Farah v. Esquire Mag.*, 736 F.3d 528, 541 (D.C. Cir. 2013).[2] That limitation is not happenstance: the Lanham Act's drafters, as well as courts interpreting the Act, have deliberately limited its scope to commercial speech to avoid the obvious First Amendment problems that would result from allowing adversaries in politics and policy to bring false advertising claims against each other. *See, e.g.*, *Groden v. Random House, Inc.*, 61 F.3d 1045, 1052 (2d Cir. 1995) (affirming dismissal of Lanham Act claims and noting "we have been careful not to permit overextension of the Lanham Act to intrude on First Amendment values"). Because there is no definition of commercial speech which plausibly covers CTT's political advocacy, YMTC has failed to state a claim under the Lanham Act. *See Farah*, 736 F.3d at 541 (affirming dismissal of Lanham Act claims for failure to plausibly concern commercial speech).

*Second*, because the CTT publications "petition the Government for a redress of grievances," U.S. Const amend. I, the *Noerr-Pennington* doctrine bars YMTC's effort to suppress them through litigation. Although that doctrine arose in the antitrust context, it stands "for the

---

[2] Unless otherwise noted, quotations omit all internal quotation marks and citations and previous alterations.

proposition that when a person petitions the government for redress, the First Amendment prohibits any sanction on that action." *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 696 (D.C. Cir. 2009). There is no dispute that CTT was petitioning the government. The Complaint itself says so, averring that the "campaign" allegedly waged by CTT "targeted District-based policymakers" and "agencies," among others. Compl. ¶ 28. Thus, even if the Complaint properly alleged a violation of the Lanham Act, the *Noerr-Pennington* doctrine still compels its dismissal. *See, e.g.*, *Nader v. The Democratic Nat'l Comm.*, 555 F. Supp. 2d 137, 156 (D.D.C. 2008) (granting motion to dismiss due to *Noerr-Pennington* immunity).

*Third*, setting aside the *Noerr-Pennington* doctrine, and even treating the CTT articles as advertising, the five statements in those articles upon which YMTC relies cannot form the basis of Lanham Act claims. Four are arguments about what *could* happen in the future and cannot either be objectively false or misleading to YMTC's customers. *See Fernandez v. Jones*, 653 F. Supp. 2d 22, 32 (D.D.C. 2009) (dismissing Lanham Act claims as not literally false or actually misleading). And the fifth statement with which YMTC takes issue was made more than 18 months before YMTC claims to have suffered an injury, meaning that any alleged harm does not plausibly "flow[] directly from" the statement. *MiMedx Grp., Inc. v. DBW Partners LLC*, 2018 WL 4681005, at *8-*9 (D.D.C. Sept. 28, 2018) (dismissing Lanham Act false advertising claim because plaintiff failed to "connect [the allegedly false] statements to a competitive injury").

## BACKGROUND

### A.    The Controversy Surrounding Importation of YMTC Products

YMTC is a Chinese company that manufactures memory chips. Compl. ¶ 21. Since at least the early 2000s, the United States' importation of technology manufactured in mainland China has been a source of controversy. *See* Ex. 1 at 3-5. In 2012, for example, a report by the House Permanent Select Committee on Intelligence raised numerous concerns, including possible

"efforts to insert malicious hardware or software implants into Chinese-manufactured telecommunications components and systems marketed to the United States."[3]  By 2022, leaders in both political parties were calling for tighter regulation, fearing "the economic and national security threats posed by YMTC and other CCP-backed technology companies," with "CCP" referring to the Chinese Communist Party.  168 Cong. Rec. H8877-01, H9234 (December 8, 2022) (floor remarks by Sen. Schumer in support of an amendment jointly sponsored by Sen. Cornyn).

A particular flashpoint within the controversy occurred in 2022, when YMTC tentatively reached a deal to supply Apple with memory chips for use in iPhones.  *See* Compl. ¶¶ 34-35, 61; Ex. 4.  Senator Tom Cotton publicly wrote to Apple's CEO, stressing "the risks of this partnership with an entity that may soon be the target of U.S. government action."[4]  He also introduced a bill (jointly with Congressman Mike Gallagher) to "impose crippling sanctions" on YMTC, citing its "well documented ties to the CCP."[5]  Then-Senator Marco Rubio warned Apple that it was "playing with fire," and would "be subject to scrutiny it has never seen from the federal

---

[3] House Permanent Select Committee on Intelligence, Investigative Report on the U.S. National Security Issues Posed by Chinese Telecommunications Companies Huawei and ZTE, *available at https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=327*, at 2–3 (Oct. 8, 2012).  In considering a motion to dismiss, district courts may rely on public statements posted on the internet "to show that those statements were made."  *Farah v. Esquire Mag., Inc.*, 863 F. Supp. 2d 29, 35 (D.D.C. 2012).  They can further take notice of underlying assertions that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b)(2), including matters of public record.  *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).

[4] Sen. Tom Cotton, *Cotton Warns Apple Not To Do Business With Dangerous Chinese Chipmaker*, Sept. 15, 2022, https://www.cotton.senate.gov/news/press-releases/cotton-warns-apple-not-to-do-business-with-dangerous-chinese-chipmaker.

[5] Sen. Tom Cotton, *Gallagher, Cotton Introduce Legislation to Impose Crippling Sanctions on YMTC*, Sept. 30, 2022, https://www.cotton.senate.gov/news/press-releases/gallagher-cotton-introduce-legislation-to-impose-crippling-sanctions-on-ymtc.

government" due to "the security risks posed by YMTC."  Ex. 2.  "A month after Rubio's remarks, Apple abandoned plans to use YMTC in iPhones."  *Id.*

The federal government has considered, and in some cases adopted, several measures to protect America's economy and national security against threats posed by YMTC.  In December 2022, YMTC was added to the so-called Entity List "for posing a significant risk of becoming involved in activities contrary to the national security or foreign policy interests of the United States."  87 Fed. Reg. 77505-01, 77506; *see also* 15 C.F.R. Pt. 744, Supp. 4.  Citing, among other risks, "numerous opportunities for adversaries and other threat actors to introduce hardware backdoors, malicious firmware, and malicious software into a semiconductor during production," the Department of Defense proposed amending the Federal Acquisition Regulation to generally prohibit federal agencies from procuring products that use YMTC semiconductors.  89 Fed. Reg. 36738-01.  And Section 5949 of the National Defense Authorization Act of 2023 specifically lists "Yangtze Memory Technologies Corp (YMTC)" as a manufacturer whose semiconductors cannot be purchased by the federal government absent cabinet-level waivers.  Pub. L. 117-263, 136 Stat. 2395, § 5949.

**B.    China Tech Threat's Political Advocacy**

This case concerns the role of a particular advocacy group, CTT, in that political controversy.  *See* Compl. ¶¶ 8-15; Ex. 1 at 1.  Led by a retired U.S. Army General, CTT lobbies against the growing power and influence of Chinese government-backed technology companies, maintaining that their products present multiple risks to the United States.  *See, e.g.*, Exs. 1-4, 6, 7.  Although "CTT is far from the only voice raising alarm about Chinese technology, a rare area of bipartisan agreement," its "reports take a hard-line position on restriction of Chinese tech and can frame issues with unusually aggressive language."  Ex. 1 at 2-3.

CTT advocates for its positions in several ways.  As part of notice-and-comment

rulemaking, CTT has urged the FCC to more tightly regulate Chinese technology companies, including YMTC. *See* Ex. 7 at 4. It also provides information directly to elected and appointed officials. *See, e.g.*, *id.* at 7 (touting an event attended by an FCC commissioner); Ex. 1 at 3-4 (noting that "CTT provides research and testifies at hearings, and some legislators say they've worked with it directly," including one legislator who said she relied on CTT despite allegations it received funding from Dell Technologies).

CTT and its members also publish extensively on a website bearing its name, as well as in other publications, such as *Forbes*. *See* Compl. ¶ 8; Exs. 1, 2, 3. For example, in July 2021, CTT praised the Biden Administration's nominee to lead the Commerce Department's Bureau of Industry and Security (BIS), asserting that the choice "signal[ed] that the Biden administration underst[ood] the threat posed by China and [was] taking it seriously." Ex. 6 at 2. CTT further urged the Senate committee taking up the nomination to ask the nominee "how he intends to strengthen controls on strategic technologies like advanced semiconductor manufacturing equipment, whether BIS will move quickly to restrict known semiconductor fabs aligned with the Chinese military like YMTC and [another company], and how BIS will enforce the updated requirements of the Export Control and Reform Act (ECRA) of 2018." Ex. 6 at 2. Similarly, CTT later published a lengthy article urging a broader implementation of the Secure and Trusted Networks Act of 2019 and the 2021 Secure Equipment Act. Ex. 7. CTT's work has been cited by "influential think tanks such as the Heritage Foundation and news outlets like Axios," allowing it to further influence policymakers. Ex. 1 at 4.

The Complaint targets statements criticizing YMTC found in two pieces published by CTT. The first of the two was published on January 4, 2021—well before the specific controversy concerning Apple arose. Ex. 3. The short article flagged the threat that YMTC's "state-sponsored

growth could position the People's Republic of China to unseat the United States as a leader in next-generation flash memory." Ex. 3 at 1. As President Trump neared the end of his first term, CTT urged that "[t]he Trump administration still has time to implement controls to stop the flow of semi-conductor manufacturing equipment to China, a move that President-elect Biden and his administration would like[ly] support and continue to build on." Ex. 3 at 2.

The second piece is a 20-page report focused on the dangers posed by Apple's putative deal with YMTC. Ex. 4. Entitled "Silicon Sellout," the 2022 report urged that if Apple did not cancel the deal, "US policymakers must restrict technology imports to and exports from YMTC." *Id.* at 2. CTT argued that YMTC had grown by relying on massive subsidies from the Chinese government and intellectual property theft, citing sources such as *The New York Times*. *Id.* at 5. The report contended that YMTC's deal with Apple posed five categories of threat: "National Security – The Battlefield Control Switch," "Privacy – Apple Expands Chinese Government Surveillance," "Lost U.S. Technology Leadership – The PRC's 'National Champion' Model Unfairly Eliminates Competitors," "Sluggish Economic Growth – More Supply Chain Shortages and Bottlenecks," and "Jobs – YMTC's Market Manipulation Jeopardizes U.S. Jobs." *Id.* at 8-11. In each section, the 2022 report developed its argument using a variety of sources. For example, with respect to national security, the report cited a *Bloomberg* article describing a past incident in which a Chinese microchip with the ability to give "stealth remote access" was widely sold abroad, then referenced a novel to conjure a vivid image of "U.S. fighter jets grounded because of compromised chips made in China." *Id.* at 8 & n.23.

Based on these forecasts of risk, the 2022 report advocated that "U.S. policymakers should explore the following policy measures to mitigate the security risks of Apple's deal with YMTC and protect Apple users and others." *Id.* at 12. The report offered eight options, from "Option #1

(Best Option): Restrict technology exports to and imports from YMTC" to "Option #8," creating a "reverse CFIUS," meaning a version of the Committee on Foreign Investment in the United States that would restrict American investment abroad. *Id.* at 12-15. For each option, CTT detailed its recommendations to federal officials, elected and appointed, on how to carry out its preferred options. For example, CTT urged that the BIS heed the call of several Congressmen to add YMTC to the Entity List (a step which, as described above, the government has now taken), that the Commerce Department should investigate YMTC for violations of the foreign direct product rule, and that Congress should issue subpoenas for testimony and enact the "National Critical Capabilities Defense Act" proposed by Senators Cornyn and Murphy. *Id.*

**C.    YMTC Resorts to Litigation to Stifle Its Critics**

        1.  <u>YMTC Sues Without Success in the Northern District of California</u>

In 2024, YMTC filed a complaint in the Northern District of California against a company and an individual YMTC claimed were responsible for CTT's 2021 article and 2022 report. *See Yangtze Memory Technologies Co., Ltd. et al. v. Strand Consult et al.* ("*Strand Consult*"), No. 5:24-CV-03454, Dkt. 1 (N.D. Cal. June 7, 2024). In its original complaint, YMTC brought state law claims for trade libel and unfair competition, and sought injunctions blocking further criticism of YMTC. *See id.* ¶¶ 38-55.

The defendants in the California case brought a motion to stay discovery pending their filing of a motion under California's anti-SLAPP law, which prohibits vexatious litigation designed to chill speech protected by the First Amendment. *See Strand Consult*, Dkt. 39 at pp. 5-6 (N.D. Cal. Oct. 30, 2024). Before the California defendants could file their anti-SLAPP motion, YMTC amended its complaint to replace the state claims with claims under the federal Lanham Act, which are not subject to California's anti-SLAPP statute. *See Strand Consult*, Dkt. 50 at ¶¶

61-85 (N.D. Cal. Nov. 17, 2024).[6]

On December 17, 2024, the defendants in the California case moved to dismiss YMTC's amended complaint, including on the grounds that the CTT articles were not commercial speech and thus fell outside the scope of the Lanham Act. *See Strand Consult*, Dkt. 65 (N.D. Cal. Dec. 17, 2024). The court in the California case granted the motion to dismiss on jurisdictional grounds and thus did not reach the Lanham Act arguments. *See Strand Consult*, Dkt. 81 (N.D. Cal. May 20, 2025). YMTC moved for reconsideration of the jurisdictional ruling, and that motion remains pending. *See Strand Consult*, Dkt. 88 (N.D. Cal. June 20, 2025).

2. Stymied in the Northern District of California, YMTC Brings the Same Claims in this Court

Although YMTC did not name Micron in the California case, it alleged that Micron was indirectly behind at least some of CTT's criticisms of YMTC. *See, e.g.*, *Strand Consult*, Dkt. 50 at ¶¶ 7-9. "Micron is a leading semiconductor manufacturer with deep technical expertise." Compl. ¶ 16. Headquartered in Boise, Idaho, Micron makes and sells memory and data storage products throughout the global marketplace, in competition with YMTC. *See id.* ¶ 24.

Having suffered multiple defeats in the Northern District of California, YMTC has now brought the same substantive allegations before this Court—this time naming Micron as a defendant. The Complaint advances two claims, both under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). *Id.* ¶¶ 63-74 (alleging direct liability); *id.* ¶¶ 75-87 (alleging contributory liability). Both claims name Micron and DCI, "a public affairs and strategic communications firm." *Id.* ¶ 23. Both claims allege that Micron is responsible for "funding," "orchestrating,"

---

[6] YMTC's amended complaint also added DCI as a third defendant. *See Strand Consult*, Dkt. 50 at ¶¶ 61-85 (N.D. Cal. Nov. 17, 2024).

"directing," or "instigating" CTT's criticisms of YMTC. *Id.* ¶¶ 68, 76. And both claims rely on the same five statements in CTT's articles. *Id.* ¶¶ 66, 80.

Of the five statements, one appears in the 2021 article. There, CTT asserted that YMTC "has ties to the People's Liberation Army"—a statement that the Complaint does not allege is false—and that evidence indicates that "YMTC is associated with criminal activity, including a Social Security spoofing scam, identity theft and cyber extortion," which YMTC claims is false. Ex. 3 at 1; Compl. ¶¶ 66, 80.

The remaining four statements appear in the 2022 *Silicon Sellout* report:

- In arguing that the YMTC-Apple deal could have exposed Apple customers to surveillance, CTT opined that "YMTC chips equipped with spyware and installed on Apple devices could funnel collected data back to Beijing."

- In its introduction, *Silicon Sellout* discussed YMTC's connection to the Chinese military, then argued that YMTC's deal with Apple "presents the possibility that malicious technology and practices from the Chinese military could be introduced to Apple end-users and others."

- While contending that YMTC threatened American national security, CTT discussed an incident in the 2010s when the Chinese military was alleged to have used a Chinese manufacturer to insert chips "with the capability to create remote stealth access" into commercially sold motherboards. CTT then suggested that "YMTC chips could be similarly, intentionally compromised with rogue features after normal memory products were approved and designed into the phone. These built-in and concealed vulnerabilities would not be detected during manufacturing. They could be exploited months or years later to disrupt performance or exfiltrate data from a system containing the compromised chip."

- After noting that the Pentagon has established a program to ensure the microchips used in U.S. defense manufacturing are not tampered with, CTT noted that "no such program exists for consumer devices." CTT then posited several threats posed by compromised chips, including hacking, use in a botnet attack, and a "kill switch" that "under Chinese military production, could be enabled . . . to shut down [electronics] remotely by an unauthorized Chinese government actor."

Ex. 4 at 1, 8, 9, 11; Compl. ¶¶ 66, 80. According to YMTC, the quoted statements constitute false advertising under the Lanham Act. Compl. ¶¶ 66, 80.

3. <u>YMTC Seeks to Transfer the Northern District of California Case to This Court</u>

On July 21, 2025, YMTC moved to transfer the California case to this Court, citing connections to this District, including that CTT "specifically recommended that the United States Federal Communications Commission ('FCC') prohibit equipment authorizations containing chips from YMTC and lauded their efforts to influence the U.S. Congress regarding the Secure Equipment Act." *Strand Consult*, Dkt. 91 at 16 (N.D. Cal. July 21, 2025).

**LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). When ruling on a motion to dismiss, "the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions." *Anthony v. Int'l Ass'n of Machinists & Aerospace Workers Dist. Lodge 1*, 296 F. Supp. 3d 92, 95 (D.D.C. 2017). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Farah*, 863 F. Supp. 2d at 35.

In the context of a Lanham Act false advertising claim, a plaintiff cannot merely label the alleged false advertising as "commercial speech;" a plaintiff must plead facts from which the court can determine that the speech could "plausibly be viewed as commercial speech." *Farah*, 736 F.3d at 541; *see also, e.g.*, *Children's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742, 765 (9th Cir. 2024) (affirming dismissal of Lanham Act claim where allegations of defendant's economic interests were "far too remote from the challenged speech for it to be plausible" that the speech was commercial).

## ARGUMENT

Both claims in the Complaint should be dismissed for each of three independently sufficient reasons: (1) the CTT articles are not commercial speech subject to the Lanham Act, (2) the *Noerr-Pennington* doctrine shields CTT's lobbying, and (3) the CTT articles do not make objectively false or actually misleading statements subject to the Lanham Act.

### A.     CTT's Political Advocacy Is Not Advertising Subject to the Lanham Act

The Complaint fails to state a claim for false advertising because it targets two pieces of political advocacy that are not, by any stretch of the word, advertising. "The Lanham (Trademark) Act, 15 U.S.C. § 1051 *et seq.*, prohibits deceptive trade practices such as false advertising and trademark infringement." *Farah*, 736 F.3d at 540. The relevant provisions apply to anyone who "uses in commerce" a "false or misleading description of fact, or false or misleading representation of fact" "in connection with any goods or services." 15 U.S.C. § 1125(a)(1). "Every circuit court of appeals to address the scope of these provisions has held that they apply only to commercial speech." *Farah*, 736 F.3d at 541 (collecting cases).

For that reason, a complaint that targets non-commercial speech, such as political opinion or advocacy, must be dismissed. In *Farah*, for example, the D.C. Circuit affirmed the dismissal of a complaint by a publisher who printed a book about President Obama's birth certificate. *Id.* at 530-31. *Esquire* magazine published a political critique of the book, which the plaintiff claimed was false advertising under the Lanham Act. *Id.* Although the plaintiff alleged that he and the magazine were in commercial competition to sell journalistic works, the Circuit found that the magazine's statements "cannot plausibly be viewed as commercial speech under § 1125(a)(1)(A) or (B) of the Lanham Act." *Id.* at 541. Instead, the article was self-evidently "political speech," *id.*, and so the complaint "fail[ed] to state a claim for violation of the Lanham Act." *Id.*; *see also, e.g.*, *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672 (9th Cir. 2005) (criticism of Bosley's product

-12-

was not commercial speech because not advertising a competing product) (cited with approval in *Farah*).

There is a reason that Section 1125(a) has such a defined scope: "The Lanham Act is constitutional because it only regulates commercial speech, which is entitled to reduced protections under the First Amendment." *Taubman Co. v. Webfeats*, 319 F.3d 770, 774 (6th Cir. 2003); *see also Farah*, 863 F. Supp. 2d at 40 ("[T]he Lanham Act restricts only commercial speech, as commercial speech is entitled to reduced protection under the First Amendment."). As many courts have noted, Congress inserted the phrase "uses in commerce" into the Lanham Act to limit the Act to commercial speech precisely because it wished to exclude political expression from the Act's ambit, thus avoiding First Amendment concerns. *See, e.g.*, *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1383 n.6 (5th Cir. 1996); *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 406 F. Supp. 3d 1258, 1286 (M.D. Ala. 2019), *aff'd* 6 F.4th 1247 (11th Cir. 2021). As a result, the Lanham Act "cannot be used to quash" a speaker "who is communicating ideas or expressing points of view." *Farah*, 736 F.3d at 541.

Quashing a speaker who is communicating ideas and expressing points of view is exactly what YMTC is attempting to do in the Complaint. The CTT publications at issue are obviously not advertising, and are obviously political speech. The 2021 article urged the first Trump administration to use its final month in power to restrict U.S. exports that could aid YMTC's manufacturing, and further suggested that the incoming Biden administration pursue the same policy. Ex. 3 at 1. The article contains nothing resembling the promotion of any product. It calls for limits on YMTC not in the context of consumer affairs, but rather while criticizing China's state sponsorship of YMTC and suggesting that "the United States should restrict and 'decouple' its entire semiconductor industry from the People's Republic of China." *Id.* at 2. Similarly, the

2022 report urges "U.S. policymakers"—naming, at various times, Congress, the President, and specific agencies—to adopt a detailed list of "policy measures," based on national security and economic risks posed by YMTC. Ex. 4 at 12. At no point in its 20 pages of argument and analysis does it advertise any product.

YMTC has nonetheless sprinkled the Complaint with conclusory allegations that CTT's publications are a "false advertising campaign." Compl. ¶¶ 14, 22. But this Court need not accept such implausible mischaracterizations of the statements at issue. In *Farah*, for example, the district court dismissed the complaint after carefully reviewing the article in question, along with various public statements and publications, then rejecting the complaint's allegation that the article was "Internet advertising." 863 F. Supp. 2d at 32-34, 37-40. The D.C. Circuit did the same, finding the allegation that the speech at issue constituted commercial speech to be implausible. *Farah*, 736 F.3d at 531-33, 540. This Court should follow suit. Even without the many public statements confirming that CTT was lobbying officials on a matter of policy (*see supra* at 2-4), reviewing Exhibits 3 and 4—the CTT articles in question—demonstrates that they are "political speech expressing a point of view, not commercial speech attempting to promote a good or service." *Nichols v. Club for Growth Action*, 235 F. Supp. 3d 289, 298 (D.D.C. 2017) (dismissing Lanham Act claims); *see also, e.g.*, *Coral Ridge Ministries*, 406 F. Supp. 3d at 1291 (dismissing Lanham Act claim where allegation that speech sought "to influence the relevant consumers to buy [defendant's] goods and services does nothing more than state a legal conclusion and an element of the Lanham Act claim").

The caselaw concerning commercial speech confirms that dismissal is the only appropriate result here. "Commercial speech is defined as 'expression related solely to the economic interests of the speaker and its audience' or 'speech proposing a commercial transaction.'" *United States*

-14-

*v. Philip Morris USA Inc.*, 566 F.3d 1095, 1143 (D.C. Cir. 2009) (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561–62 (1980)).  The CTT publications cannot plausibly be read to relate solely to the economic interests of CTT, much less their obvious audience, the policymakers whom they urge to take action.  Nor does CTT propose a commercial transaction in either article.

To be sure, courts have recognized commercial speech outside "the core notion of commercial speech—speech which does no more than propose a commercial transaction." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983).  *Bolger*, for example, concerned "informational pamphlets" mailed by a contraceptives manufacturer "discussing the desirability and availability of prophylactics in general or [the manufacturer's] products in particular." *Id.* at 62.  The pamphlets were "conceded to be advertisements" and "refer[ed] to a specific product," and the manufacturer had "an economic motivation for mailing the pamphlets." *Id.* at 66-67.  The Court made clear that none of these three characteristics individually sufficed to make the pamphlets commercial speech, but the "combination of *all* these characteristics" supported the district court's characterization of the pamphlets as commercial speech. *Id.*  Courts thus examine those three factors to determine whether speech can properly be considered commercial. *See, e.g.*, *Am. Hosp. Ass'n v. Azar*, 468 F. Supp. 3d 372, 390 (D.D.C. 2020) (Nichols, J.).

Examining the three *Bolger* factors further confirms that the CTT articles are not commercial speech.  Neither the 2021 article nor the 2022 report are "conceded to be advertisements."  Because both clearly are not, the first *Bolger* factor is not satisfied.  Nor does either publication "refer to a specific product." Although the articles certainly criticize YMTC as a corporation and attack its products generally based on their potential strategic and economic dangers, political criticism does not become commercial speech simply because the target of the

-15-

criticism sells a product. All of the criticism in *Farah*, for example, concerned a book just made available for sale, yet the Circuit had little trouble concluding that it was not commercial speech. *See Farah*, 736 F.3d at 530-31, 541.

YMTC attempts to suggest that CTT was promoting Micron's products, writing that the 2022 report "implores Apple to 'source its chips from existing suppliers like Micron' or 'source memory chips from non-Chinese chipmakers like Micron.'" Compl. ¶ 56 (quoting Ex. 4 at 2, 12).[7] That is selective excerpting at its worst. The full quotes state that Apple "can source its chips from existing suppliers like Micron, Kioxia, Samsung, SK Hynix, Western Digital, and Intel" and "source memory chips from non-Chinese chipmakers like Micron, Kioxia, Samsung, SK Hynix, Western Digital, and Intel." Ex. 4 at 2, 12. In other words, the report is plainly not urging Apple to buy Micron chips but rather urging it to buy chips from anyone other than YMTC, because of the unique national security, political, and economic risks posed by the CCP-backed company.

Similarly, the reference to "Idaho-based Micron" as "the only American company" leading in memory chip manufacturing, Compl. ¶ 56, cannot be read as a stealth ad for Micron. To start, it references an entire company, not "a specific product." *See Radiance Found., Inc. v. N.A.A.C.P.*, 786 F.3d 316, 332 (4th Cir. 2015) (article that made "passing reference" to company, but "did not even mention [the company's] services" was not commercial speech); *Edward Lewis Tobinick, MD v. Novella*, 848 F.3d 935, 951 (11th Cir. 2017) (article that mentioned doctor's medical practice but did not "discuss any products for sale" was not commercial speech). More fundamentally, the reference has nothing to do with promoting sales of Micron's goods. It appears

---

[7]  The Complaint states that it is quoting pages 4, 8, and 14 of Exhibit 4, but the quoted language does not appear on those pages of Exhibit 4, and does appear on pages 2 and 12.

in a lengthy exploration of how volatility in the chip market led to a steady reduction in the number of surviving chip manufacturers, how stabilization in that market was detrimental to Apple's interest in declining chip prices, and how YMTC could therefore appeal to Apple by offering cheaper chips based on its receipt of massive subsidies from the PRC. *See* Ex. 4 at 6-7. That is, CTT was doing the exact opposite of promoting Micron's product to Apple, and instead explaining why Apple might prefer *YMTC*'s subsidized products—thus supporting CTT's political argument that the government should act to reduce YMTC's unfair advantages. The second *Bolger* factor thus also confirms that the CTT publications are not commercial speech. *See Coral Ridge Ministries Media, Inc.*, 406 F. Supp. 3d at 1291 (speech was not commercial where it aimed to "shut down" plaintiff for political reasons, rather than to promote defendant's product).

The final factor, whether the speaker has "an economic motivation," also does not convert CTT's advocacy into commercial speech. The Complaint touts the statement of a CTT member that "on the content on China Tech Threat, we have made money." Compl. ¶ 10. But most authors seek to make money by publishing their work. *Esquire* Magazine, the defendant in *Farah*, plainly had an economic motivation to publish the article in question, but that did not transform the article into commercial speech. *Farah*, 736 F.3d at 541. Economic motivation in this context means the sort of motive to sell a product found in *Bolger*, not just any profit motive. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 266, (1964) ("That the Times was paid for publishing the advertisement is as immaterial in this connection"—that is, whether a political ad placed by the NAACP constituted commercial speech—"as is the fact that newspapers and books are sold").

Equally immaterial is any suggestion that Micron's competition with YMTC supplies the requisite economic motivation. This Court need not accept the entirely conclusory allegations that what is manifestly advocacy for strict regulation of YMTC was somehow an ad for Micron's

products. The Complaint's claims that these lobbying pieces were actually "targeting YMTC's customers and commercial partners," Compl. ¶ 58, are unsupported by factual detail, and thus present the sort of bare attempts at legal sufficiency that courts routinely reject on motions to dismiss. *See, e.g.*, *Farah*, 736 F.3d at 540; *Coral Ridge Ministries Media Inc.*, 406 F. Supp. 3d at 1219; *Keel v. Axelrod*, 148 F. Supp. 3d 411, 422 (E.D. Pa. 2015) (dismissing Lanham Act complaint where plaintiff failed to "allege a plausible fact that suggests [the defendant] actually wrote [the challenged work] to promote his [business] to potential clients").

To the extent the economic motivation imputed to Defendants is the hope that CTT's advocacy would result in regulatory action against a competitor, thereby generally boosting Micron's bottom line, that, too, is insufficient. Almost any action a corporation takes will have an economic motive in that sense. For example, a utility company advocating favorable policy positions on nuclear power may ultimately hope to profit from better regulatory treatment, but it is still entitled to the higher protections afforded to discussing "controversial issues of public policy." *Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 544 (1980). And even if a corporation's generalized desire to increase its profits could tilt this one factor, "an economic motivation . . . would clearly be insufficient by itself to turn the materials into commercial speech." *Bolger*, 463 U.S. at 67.

Because the CTT pieces are not commercial speech, they fall outside the scope of the Lanham Act. For that reason alone, the Complaint should be dismissed. That conclusion in no way requires evaluating the accuracy of the five particular statements challenged by YMTC. *See* Compl. ¶¶ 66, 80. The Lanham Act avoids First Amendment concerns because its statutory text applies only to commercial speech, meaning that once a court determines the speech is not commercial, the veracity of the underlying statements becomes irrelevant and the Lanham Act

claims fail. That is why *Farah*, *Coral Ridge Ministries*, and other cases could swiftly dismiss Lanham Act allegations without needing to delve into disputes about their accuracy. This Court should do the same. *See also, e.g.*, *Crash Proof Ret., LLC v. Price*, 533 F. Supp. 3d 227, 229 (E.D. Pa. 2021) (granting motion to dismiss Lanham Act claims because "the Lanham Act does not regulate critical speech. It regulates commercial speech, which [the defendant's] article is not.").

## B.     CTT's Political Advocacy Is Protected by the *Noerr-Pennington* Doctrine

The CTT articles at issue indisputably "petition the government for a redress of grievances," U.S. CONST amend. I, asking Congress and the Executive to remedy a host of political ills that CTT traces to YMTC. The Complaint admits as much, alleging that CTT's "campaign" has "targeted" "policymakers" and "agencies" in Washington, D.C. Compl. ¶ 28. And the exhibits YMTC incorporated in its Complaint are replete with explicit petitioning. *E.g.*, Ex. 3 at 2 ("The Trump administration still has time to implement controls to stop the flow of semi-conductor manufacturing equipment to China."); Ex. 4 at 2 ("US policymakers must restrict technology exports to and imports from YMTC."). Thus, even if the Complaint stated claims under the Lanham Act, it must still be dismissed because "[t]he *Noerr–Pennington* doctrine holds that defendants who petition the government for redress of grievances . . . 'by efforts to influence legislative or executive action' . . . are immune from liability for such activity under the First Amendment." *Nader*, 555 F. Supp. 2d at 156 (quoting *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 677 (D.C. Cir. 2005)) (granting motion to dismiss due to *Noerr-Pennington* immunity); *see also, e.g.*, *Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 230 (D.D.C. 2022) (granting motion to dismiss claims based on *Noerr-Pennington* immunity for lobbying activity); *Jones v. Louisiana State Bar Ass'n*, 738 F. Supp. 2d 74, 80-81 (D.D.C. 2010) (same).

The *Noerr-Pennington* doctrine began with *E.R.R. Presidents Conference v. Noerr Motor*

*Freight, Inc.*, 365 U.S. 127 (1961). As in this case, the *Noerr* plaintiffs alleged that their competitors had waged "a publicity campaign" against them, attacking their businesses in publications such as "magazine articles." *Id.* at 140, 142. There, as here, plaintiffs claimed that the defendants masked their publicity efforts as "declarations of independent groups"—what the *Noerr* plaintiffs called the "third-party technique," *id.* at 140, and YMTC has dubbed "astroturfing," Compl. ¶ 9. Also, there, as here, the plaintiffs alleged that the publicity campaign targeted their customers, but its content appealed to public harms, seeking "to influence governmental action." *Noerr*, 365 U.S. at 143. The *Noerr* plaintiffs alleged that this was anticompetitive conduct in violation of the Sherman Antitrust Act. The Court disagreed, construing the Act to avoid infringing "[t]he right to petition." *Id.* at 137-38 (applying the Sherman Act to the defendants' publicity campaign "would impute to the Sherman Act a purpose to regulate, not business activity, but political activity"); *see also United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965) ("*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose.").

Although *Noerr* and *Pennington* interpret the Sherman Act, "the *Noerr–Pennington* doctrine stands for a generic rule of statutory construction, applicable to any statutory interpretation that could implicate the rights protected by the Petition Clause." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 931 (9th Cir. 2006). For that reason, "[t]he Supreme Court" and multiple circuit courts "have extended the scope of the *Noerr–Pennington* doctrine beyond the antitrust context." *Barnes Found. v. Twp. of Lower Merion*, 242 F.3d 151, 159 (3d Cir. 2001); *see, e.g.*, *Havoco of Am., Ltd. v. Hollobow*, 702 F.2d 643, 649 (7th Cir. 1983) (recognizing application of *Noerr-Pennington* doctrine to tortious interference claims). Multiple district courts have thus applied the *Noerr-Pennington* doctrine to bar Lanham Act false advertising claims. *E.g.*, *Sliding*

*Door Co. v. KLS Doors, LLC*, 2013 WL 2090298, at \*7 (C.D. Cal. May 1, 2013) ("Defendants'

false advertising claim under section 43(a) of the Lanham Act is dismissed as barred by the *Noerr–*

*Pennington* doctrine."); *UCP Int'l Co. Ltd. v. Balsam Brands Inc.*, 420 F. Supp. 3d 966, 983 (N.D.

Cal. 2019) (same); *Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 249 F. Supp. 2d 463,

493 (M.D. Pa. 2003) (applying *Noerr-Pennington* doctrine to Lanham Act § 43(a) claims), *aff'd*

*on different grounds in relevant part*, 401 F.3d 123 (3d Cir. 2005).[8]

Applying the *Noerr-Pennington* doctrine here is straightforward: the CTT articles are

petitioning activity, meaning that the Lanham Act cannot apply to them, and so YMTC's claims

must be dismissed.  That YMTC has also alleged an intent to influence customers cannot change

that.  YMTC has admitted that CTT's articles are targeted at policymakers and agencies, Compl.

¶ 28, meaning that even if the Court chose to accept YMTC's conclusory and implausible

statements that customers were *also* an intended audience, *see supra* at 15-18, the challenged

statements would remain petitioning activity.  As noted above, *Noerr* itself involved a publicity

campaign that, at least according to the plaintiffs, also sought to make the plaintiffs' businesses

less appealing to their customers.  *Noerr*, 365 U.S. at 144.  But as the Supreme Court explained,

any publicity campaign will likely have that effect, and so "to hold that the knowing infliction of

such injury renders the campaign itself illegal would thus be tantamount to outlawing all such

campaigns."  *Id.*; *see also, e.g.*, *Balsam Brands*, 420 F. Supp. 3d at 983 ("Whether additional

---

[8]   This Court has expressed uncertainty as to whether the *Noerr-Pennington* doctrine applies to
tortious interference claims. *Jefferson-11th St., LLC v. D.C.*, 2020 WL 3035038, at \*6-\*7 (D.D.C.
June 5, 2020).   Because *Noerr-Pennington* is a statutory interpretation doctrine based on
Congress's presumed reluctance to legislatively infringe the Petition Clause, *see Noerr*, 365 U.S.
at 137-38, its application to a federal statute such as the Lanham Act is far clearer than its
application to common law torts.

reasons motivated Balsam's statements—including a desire to promote sales, a possibility discussed above—they are still covered by" the *Noerr-Pennington* doctrine.).

YMTC also cannot invoke the "sham" exception to the *Noerr-Pennington* doctrine. "There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Noerr*, 365 U.S. at 144. But as in *Noerr*, "[n]o one denies that the" defendants "were making a genuine effort to influence legislation" and other government action. *Id.* To the contrary, YMTC *concedes* it. Compl. ¶ 28. The exhibits YMTC attached to its complaint show both that CTT worked to influence government officials, and in at least one instance actually had such influence. *See, e.g.*, Ex. 1 at 3-4 (discussing CTT's efforts to influence legislators, including one who acknowledged relying on CTT's information); Ex. 7 at 4 (CTT touting an event attended by an FCC commissioner). And YMTC's motion to transfer the California case also acknowledges CTT's lobbying of Congress and the FCC to take official action against YMTC. *See Strand Consult*, Dkt. 91 at 16 (N.D. Cal. July 21, 2025).

YMTC cannot circumvent the *Noerr-Pennington* doctrine simply by asserting that CTT's claims are false. Although misrepresentations may lose protection in adjudicatory settings, the same is not true in the political arena. As the Supreme Court has explained, falsehoods made to courts—such as perjury or fraud—are not protected by the First Amendment because such conduct is already subject to sanction within the judicial process. *See California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 512–14 (1972). In contrast, misrepresentations made during efforts to influence legislation or executive action are protected, even if they are deceptive or unethical, because Congress has historically exercised "extreme caution in legislating" in that area. *Id.* at 512; *see also Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499–500

(1988) (explaining that a publicity campaign seeking government action retains *Noerr-Pennington* immunity even if it employs deceptive tactics).

Courts have consistently applied this principle. For example, the court found *Noerr-Pennington* immunity applicable where plaintiffs alleged the defendants made knowingly false statements at press conferences, in media interviews, and on websites in *Feld Entertainment Inc. v. A.S.P.C.A.*, 873 F. Supp. 2d 288, 307–08 (D.D.C. 2012). Likewise, the court dismissed false advertising claims under the Lanham Act despite allegations that the defendant's statements were "patently false" in *AirHawk Int'l, LLC v. TheRealCraigJ, LLC*, 2017 WL 3891214, at *3 (C.D. Cal. Jan. 19, 2017). If YMTC wishes to challenge the truth of CTT's statements, it must do so in the marketplace of ideas—not through false advertising claims that target constitutionally protected petitioning.

## C.    The Complaint Does Not Plead Facts Showing CTT's Statements Are Objectively False or Misled the Target Audience

Even hypothesizing that CTT's statements were advertising, and were not petitioning activity, they could not form the basis for Lanham Act claims. The Lanham Act is satisfied only where the statements in question are, among other things, (1) "literally false or misleading to the public or verifiably false or misleading," and (2) "actually or likely injurious" to the plaintiff. *Fernandez*, 653 F. Supp. 2d at 31–32 (dismissing Lanham Act claim).

The statements in the 2022 report fail to satisfy the first requirement. To be literally false or misleading under the Act, a statement must be a "specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact." *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 496 (5th Cir. 2000). For literal falsehood, it does not suffice that YMTC disagrees with CTT, or even that it might persuade others of its position; a literally false claim "is bald-faced, egregious, undeniable, over the top" and conveys "an

-23-

unambiguously deceptive" meaning. *FedEx Ground Package Sys., Inc. v. Route Consultant, Inc.*, 97 F.4th 444, 453 (6th Cir. 2024) (affirming dismissal of Lanham Act claims). And reliance on misleading statements requires pleading facts showing that "a significant portion" of the defendant's intended audience was deceived. *Id.*; *see also, e.g.*, *Picket Fence Preview, Inc. v. Zillow, Inc.*, 2023 WL 4852971, at *4 (2d Cir. July 31, 2023) (affirming dismissal of Lanham Act claim where complaint's allegations that customers were misled lacked specific facts tending to prove that conclusion).[9] The Complaint pleads no facts showing that the statements in the report were literally false, or that the supposed commercial audience of this supposed ad—sophisticated wholesale chip purchasers like Apple—was misled by those statements.

The 2021 CTT article fails the second requirement. YMTC claims injuries that occurred in late 2022—when its tentative deal with Apple fell through—which it traces to YMTC's activity in "mid-2022." Compl. ¶ 61. The 2021 article was published more than a year earlier, well before YMTC even negotiated the Apple deal, and so cannot form a plausible basis to show "deception of consumers" that "cause[d] them to withhold trade from the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014).

  1. <u>The Four Statements in the 2022 CTT Report Are Neither Statements of Verifiable Fact Nor Misleading</u>

The statements in the 2022 report offer argument or prediction concerning what could happen in the future, and therefore cannot be literally false statements of verifiable fact. Take the first statement from the 2022 report targeted by the Complaint: "YMTC chips equipped with spyware and installed on Apple devices could funnel collected data back to Beijing." Compl.

---

[9] By contrast, a showing of literal falsity creates a presumption of deception, relieving plaintiffs of the need to allege specific facts showing actual deception. *Fedex*, 97 F.4th at 453.

¶ 66(b). Even viewed in isolation, the statement cannot be a literally false statement of objective fact—it asserts what compromised chips *could* do, not that YMTC chips *are* presently equipped with spyware that does such things. *See, e.g.*, *Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 680 (5th Cir. 1986) (prediction that movie could be the blockbuster of the summer was not statement of objective fact); *Hamilton Exhibition, LLC v. Imagine Exhibitions, Inc.*, 2019 WL 2590639, at *5 (S.D.N.Y. June 11, 2019) (prediction that event "could be produced on a budget of $6 million" was a prediction of future events, and thus not a false representation of fact). That is even clearer in context, because the surrounding text discusses future risks of such tampering that would confront Apple or another manufacturer with "[an] increasingly difficult proposition," due to Beijing's power over companies operating in China. Ex. 4 at 9; *see Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 513 (7th Cir. 2009) ("[T]he alleged literal falsehood must be considered in context and with reference to the audience to which the statement is addressed.").

Nor does the Complaint allege facts showing that YMTC's potential customers would be misled by this statement. YMTC argues that memory chips do not contain the components necessary to transmit data, that it could not install or "clandestinely utilize" such components "without the device manufacturer knowing," and that as a sophisticated player in the industry, Micron "know[s] this." Compl. ¶¶ 15-16. That gives away the game: the "device manufacturer"—for example, Apple—*is* both the customer that would know if the chips were altered, and itself necessarily a sophisticated player in the industry that would have the same expert capacity to evaluate these statements as Micron. It is implausible at best to assert that companies like Apple would detect any spyware in YMTC's chips, but would nonetheless be fooled by CTT's assertion that the spyware would be undetectable. *See Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.*, 902

-25-

F.2d 222, 229-30 (3d Cir. 1990) ("[A] target audience's special knowledge of a class of products is highly relevant to any claim that it was misled by an advertisement for such a product.").[10]

Moreover, the non-CTT report that YMTC has incorporated in the Complaint as evidence does not say that it is impossible for memory chips to be modified to conduct surveillance, only that it is expensive to do so:

> Memory chips like those made by YMTC pose less of a mass data collection risk, per Serge Egelman, a computer scientist and researcher at the University of California, Berkeley. Microchips with secret components for intelligence gathering have been seen in the past, targeting specific individuals, but the high cost of adding transmission capabilities is an obstacle to implementing such a program at scale, Egelman noted.

Ex. 2 at 3; *see also* Compl. ¶ 61 (relying on Ex. 2). The degree of risk that YMTC's chips could, in the future, be clandestinely equipped with surveillance equipment is thus something potential YMTC customers can assess for themselves. *See Wysong Corp. v. APN, Inc.*, 889 F.3d 267, 272 (6th Cir. 2018) (Lanham Act claim properly dismissed where target audience—dog owners— would not be misled by any suggestion that dog food was made from choice cuts of meat).

The same is true of the other three statements in the 2022 report identified by the Complaint. The next two are similar arguments that YMTC chips could be tampered with in the future: "YMTC chips . . . present the possibility that malicious technology . . . from the Chinese military could be introduced to Apple end-users," and "YMTC chips could be . . . intentionally compromised with rogue features . . . These built-in and concealed vulnerabilities would not be

---

[10] It is clear from the text of the article and indeed the Complaint itself that the true target audience for the CTT articles was government officials who might regulate YMTC. *See supra* 12-19. But for purposes of this section, this motion assumes *arguendo* that the articles are advertising solely directed at YMTC's potential customers, as would be necessary to survive dismissal on the first two grounds in the motion.

detected during manufacturing.  They could be exploited . . . to disrupt performance or exfiltrate data."  Compl. ¶¶ 66(c), 66(d).  Like the first statement, these two statements are claims about what bad consequences *could* occur in the future, not objectively measurable statements of current fact.  They also could not be misleading to any audience, much less savvy tech companies like Apple.  Nothing in the Complaint (or reality) suggests that the insertion of "malicious technology" or "rogue features" into electronics is so impossible that it is misleading to say that it could happen.  To the contrary, it has happened before and could happen again, as Congress and the Department of Defense have repeatedly flagged with respect to YMTC and companies like it.  *Supra* at 3-4.

The fourth statement also warns about possible tampering, but without even naming YMTC: "Electronics with embedded chips are enabled with a 'kill switch' . . . Such features, under Chinese military production, could be enabled . . . to shut down [electronics] remotely by an unauthorized Chinese government actor."  Compl. ¶ 66(e).  YMTC says that this statement "misleadingly suggested that YMTC's memory chips could execute code and activate a 'kill switch.'"  *Id.*  It therefore does not appear to be advancing a literal falsity claim, and with good reason.  The statement does not mention YMTC, appears in a paragraph that does not mention YMTC, talks about hypothetical future risks, and appears after a paragraph that also does not mention YMTC—but rather describes a piece of futuristic fiction entitled *Ghost Fleet: A Novel of the Next World War*.  *See* Ex. 4 at 8.  The statement is thus best read as another warning of future risk, which cannot be literally false.  *See, e.g.*, *Sientra, Inc. v. NewMedical Tech., Inc*, 2019 WL 1460616, at *3 (C.D. Cal. Feb. 28, 2019) (warning that California would be the next state to pass a restrictive bill was a "mere statement[] of opinion regarding future events" and "not actionable" under the Lanham Act).  And even if it were also susceptible to YMTC's reading, that would not suffice, because "an ambiguous statement can't be literally false."  *I Dig Texas, LLC v. Creager*,

-27-

98 F.4th 998, 1010 (10th Cir. 2024) (affirming dismissal of Lanham Act claims).

There are also no factual allegations in the Complaint that show the fourth statement would mislead sophisticated chip purchasers like Apple.  That this statement is packaged with a piece of science fiction makes very clear that it is warning of possible futures, not making objective statements of current fact, misleading or otherwise.  The statement "interstellar spaceships are equipped with fusion drives that could power intergalactic travel" is not going to mislead anyone into thinking that it is an assertion of current fact rather than a description of a possible future, particularly not a rocket scientist, and especially not if paired with a *Star Trek* reference.  As with the claim about surveillance components, the type of company that purchases memory chips wholesale to mass produce electronics is not going to be misled into thinking that memory chips are presently filled with "kill switches" controlled by the Chinese government.  The Complaint thus fails to plead facts that "support a plausible inference that the challenged advertisements in fact misled a significant number of reasonable consumers."  *Fedex*, 97 F.4th at 454, 458 (dismissing Lanham Act claim where complaint did not "plausibly allege" that statement misled the particular customers at issue—there, trucking companies routinely contracting with Fedex).

To the contrary, the Complaint fails to make any concrete allegations that any specific customer or identifiable set of customers was misled by CTT's statements.  It contains general recitations, such as that "[t]hese statements deceived, or had the tendency to deceive," a laundry list of general categories, Compl. ¶ 69, but "these vague allegations are conclusory and lack supporting details." *Picket Fence Preview*, 2023 WL 4852971, at *4.  Only in one paragraph does the Complaint discuss a specific customer, "OEM Customer #1." Compl. ¶ 61.  Based on the dates there, as compared with the exhibits YMTC attached to the Complaint, OEM Customer #1 refers to Apple.  But the Complaint merely says that Apple terminated its tentative deal with YMTC

"after" CTT's campaign.  It does not allege that Apple was in fact misled by anything CTT said, or even that the termination resulted from or was related to CTT's statements.  *See id.*  Even in a vacuum, that would be insufficient, but it is particularly inadequate where the exhibits that YMTC attached to the Complaint state that Apple was under political pressure to cancel the deal, and temporally link its termination to pressure from Senator Rubio, not CTT's supposed "advertising." *See supra* at 3-4; Ex. 2 at 2 ("A month after Rubio's remarks, Apple abandoned plans to use YMTC in iPhones.").  For this reason as well, any Lanham Act claim arising from the 2022 report should be dismissed.  *See Azurity Pharms., Inc. v. Edge Pharma, LLC*, 45 F.4th 479, 498 (1st Cir. 2022) (affirming dismissal of Lanham Act claim because "the complaint makes no allegations that the [allegedly misleading s]tatements actually misled their audience").

2.    The 2021 Article Is Not Connected to Any Damages Identified by YMTC

The Complaint targets a single statement in the 2021 article.  Compl. ¶ 66(a).  Even accepting all the factual allegations in the Complaint as true, that statement cannot plausibly have been "actually or likely injurious to the plaintiff," as the Lanham Act also requires.  *ALPO Petfoods, Inc. v. Ralston Purina Co.,* 913 F.2d 958, 963–64 (D.C. Cir. 1990).  As noted above, the centerpiece of the Complaint—and the only lost business specifically alleged within it—is the tentative deal between Apple and YMTC.  The Complaint admits that this deal was struck in 2022, and alleges that it collapsed "[a]fter Defendants intensified their disinformation campaign in mid-2022."  Compl. ¶¶ 34, 61.  The 2021 article, however, was published on January 4, 2021.  *See id.* ¶ 66(a).  That is, at least one year *after* this article was published, YMTC *entered* the only deal it identifies as having later lost, and then not *because* of CTT, but merely *after* CTT's "mid-2022" efforts.  It is therefore chronologically impossible for the January 4, 2021, article to have caused the only loss YMTC identifies.  With respect to the 2021 Article, YMTC thus has not pled facts that "show economic or reputational injury flowing directly from the deception [allegedly]

wrought by [CTT]'s advertising,"[11] which "occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark Intern, Inc.*, 572 U.S. at 133 (discussing Lanham Act's proximate causation requirement). Thus, even if the 2021 article could plausibly be considered advertising, any claim based on it should be dismissed. *See, e.g.*, *Abrahams v. Simplify Compliance, LLC*, 2021 WL 1197732, at *5 (D.D.C. Mar. 30, 2021) (dismissing Lanham Act claim where plaintiff failed to plausibly allege injury caused by defendant's actions); *Black Diamond Land Mgmt. LLC v. Twin Pines Coal Inc.*, 707 F. App'x 576, 580-81 (11th Cir. 2017) (affirming dismissal of Lanham Act claim where "Plaintiff does not provide any factual support for how or why such an injury to a commercial interest has or will occur").

The Complaint also contains various vague and conclusory assertions of injuries that it may or may not be suggesting are connected to the aborted Apple deal. For example, immediately after describing the late 2022 collapse of YMTC's relationship with Apple, the Complaint alleges harms including "a 10% reduction in workforce in early 2023." Compl. ¶ 62. Two paragraphs later, the Complaint offers generalized claims of an advertising "campaign" involving undated and unidentified Twitter posts, presentations at industry conferences, and other similarly unspecified occurrences. *Id.* ¶ 64. And at various places the Complaint claims generalized losses of "good will," "reputation," and the like, although it appears to connect them only to the failed deal with Apple. *See id.* ¶ 60 (making generalized claims of loss and citing Ex. 4, the 2022 CTT Report attacking YMTC's tentative agreement with Apple); *id.* ¶¶ 5, 71, 73, 84, 86 (making similar general claims of harm without connection to any specified source). The Complaint fails to plead

---

[11] As with the 2022 report, this section adopts, for the sake of argument, the fiction that the 2021 article constitutes advertising, even though it does not mention any products competing with YMTC and appeals only to presidential administrations, seeking official action.

those facts with anything approaching the requisite specificity. "False advertising claims are subject to heightened pleading standards because of their basis in fraud." *Regal W. Corp. v. Nguyen*, 412 F. Supp. 3d 1305, 1313 (W.D. Wash. 2019).[12] Merely alluding to categories of harm with no clear connection to a specific event does not satisfy the basic requirements of Federal Rule of Civil Procedure 8, much less the heightened standards applicable to fraud claims under Rule 9(b). This Court should therefore disregard YMTC's allusions to general categories of harm, leaving only the late 2022 collapse of the Apple deal, which cannot be plausibly connected to the early 2021 CTT article. *See Barrett v. Atl. Monthly Grp. LLC*, 2024 WL 4119400, at \*19 (D.D.C. Sept. 9, 2024) (dismissing claim because "allegation[s] of generalized harm" were "insufficiently speculative"); *Samuel v. Wells Fargo & Co.*, 311 F. Supp. 3d 10, 16 (D.D.C. 2018) (dismissing fraud claim, including because "generalized, conclusory allegations of wrongdoing [were] insufficient to state a claim" under Rule 9(b)).

## D.    The Complaint Should Be Dismissed with Prejudice

"The court may dismiss a claim with prejudice when amending the complaint would be futile." *Jefferies v. D.C.*, 916 F. Supp. 2d 42, 44 (D.D.C. 2013) (citing *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996)). An amendment would be futile where the "amended complaint

---

[12] This view is not uniform. *See Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 2015 WL 13691543, at \*5 n.4 (D.D.C. Feb. 3, 2015) ("Federal courts appear to be divided as to whether Lanham Act false advertising claims must meet the Rule 9(b) specificity requirement." (citing cases)). But even courts that have found Federal Rule of Civil Procedure 9(b) does not apply to Lanham Act false advertising claims have reasoned that allegedly false statements must be pleaded with specificity for the same policy reasons underlying that rule. *See, e.g.*, *In re Century 21-RE/MAX Real Est. Advert. Claims Litig.*, 882 F. Supp. 915, 927 (C.D. Cal. 1994) ("While a Lanham Act claim is not subject to the strict pleading requirements of Rule 9 fraud claims, the policies which underlie Rule 9's requirement that the nature of an alleged misrepresentation be pleaded with specificity are equally applicable to the type of misrepresentation claims presented in a Lanham Act claim.").

would suffer from the same flaw as the original," such as where "the established law plainly prohibits [the] kind of suit" alleged in the complaint. *Id.* at 44, 46-47.

Any amendment would be futile here. YMTC's claims fail because they fall outside the scope of the Lanham Act, and because they target speech protected by the *Noerr-Pennington* doctrine, not because YMTC failed to plead sufficient facts. There is *no* set of facts YMTC could allege that would bring political, non-commercial speech like the CTT publications within the scope of the Lanham Act. *See, e.g., Agency Dev., Inc. v. Medamerica Ins. Co. of New York*, 142 F. App'x 545, 546 (2d Cir. 2005) (affirming that amendment to add Lanham Act false advertising claim would be futile where "reports at issue were not commercial speech"); *G.U.E. Tech, LLC v. Panasonic Avionics Corp.*, 2016 WL 6138422, at *6 (C.D. Cal. Feb. 4, 2016) (amendment of Lanham Act false advertising claim would be futile where "none of the alleged disparagements . . . can reasonably be said" to be commercial speech).

Similarly, the First Amendment's Petition Clause, as given effect by the *Noerr-Pennington* doctrine, protects CTT's petitioning of the government, and no facts YMTC could allege would reduce the scope of those protections. *See, e.g.*, *FilmTec Corp. v. Hydranautics*, 67 F.3d 931, 939 (Fed. Cir. 1995) ("allowing Hydranautics to amend its answer by adding an antitrust counterclaim would be a futile act" because claim was barred by *Noerr-Pennington*); *Bristol-Myers Squibb Co. v. Immunex Corp.*, 84 F. Supp. 2d 574, 578 (D.N.J. 2000) ("Amendment of the counterclaims would be futile" because the claims were "barred by the Noerr-Pennington doctrine."); *Evanger's Dog & Cat Food Co, Inc. v. Env't Democracy Project*, 2022 WL 180205, at *7 (C.D. Cal. Jan. 20, 2022) ("granting Plaintiff leave to amend its state tort claims would be futile because the *Noerr-Pennington* doctrine would bar any tort claim arising from Defendant's demand letters").

-32-

## **CONCLUSION**

For each of the foregoing reasons, the Complaint should be dismissed with prejudice.


Dated:  August 11, 2025

Respectfully submitted,

**HUESTON HENNIGAN LLP**

By: /s/ *Hagan Scotten*
Hagan Scotten, (admitted *pro hac vice*)
hscotten@hueston.com
1 Little W 12th Street
New York, NY  10014
Telephone: (646) 930-4046
Facsimile: (888) 866-4825

Doug J. Dixon, (*pro hac vice* forthcoming)
ddixon@hueston.com
Sourabh Mishra, (admitted *pro hac vice*)
smishra@hueston.com
620 Newport Center Dr., Suite 1300
Newport Beach, CA 92660
Telephone: (949) 229-8640
Facsimile: (888) 775-0898

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that: I am over the age of eighteen (18) and not a party to the within action. I am employed by the law firm of Hueston Hennigan LLP, 620 Newport Center Drive, Suite 1300, Newport Beach, CA 92660. On August 11, 2025, I served electronic copies of Defendant Micron Technology, Inc.'s Motion to Dismiss and the memorandum in support thereof on the following counsel of record via email:

Hayden Little
QUINN EMANUEL URQUHART & SULLIVAN LLP
700 Louisiana St.
Suite 3900
Houston, TX 77002
713-221-7000
haydenlittle1@gmail.com

David Needham
QUINN EMANUEL URQUHART & SULLIVAN LLP
1300 I Street, NW
Suite 900
Washington, DC 20005
(202) 538-8142
davidneedham@quinnemanuel.com

Evan Pearson
QUINN EMANUEL URQUHART & SULLIVAN
300 W. 6th
Suite 2010
Austin, TX 78701
915-588-9686
evanpearson@quinnemanuel.com

Aaron H. Perahia
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 South Figueroa Street
10th Floor
Los Angeles, CA 90017
213-443-3000
213-443-3100 (fax)
aaronperahia@quinnemanuel.com

Robert Schwartz

-1-

QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa Street
Los Angeles, CA 90017
213-443-3675
robertschwartz@quinnemanuel.com

Dale Joseph Giali
KING & SPALDING
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071
213-443-4355
213-443-4310 (fax)
dgiali@kslaw.com

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed on August 11, 2025, at Newport Beach, California

/s/ *Tina Gonzalez*
Tina Gonzalez

-2-

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that: I am over the age of eighteen (18) and not a party to the within action. I am employed in the law firm of Hueston Hennigan LLP, 620 Newport Center Drive, Suite 1300, Newport Beach, CA 92660.

I certify that on August 12, 2025 I served electronic copies of the MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT MICRON TECHNOLOGY, INC.'S MOTION TO DISMISS on the below listed counsel of record via email.

**Hayden Little**
QUINN EMANUEL URQUHART & SULLIVAN LLP
700 Louisiana St.
Suite 3900
Houston, TX 77002
713-221-7000
haydenlittle1@gmail.com


**David Needham**
QUINN EMANUEL URQUHART & SULLIVAN LLP
1300 I Street, NW
Suite 900
Washington, DC 20005
(202) 538-8142
davidneedham@quinnemanuel.com


**Evan Pearson**
QUINN EMANUEL URQUHART & SULLIVAN
300 W. 6th
Suite 2010
Austin, TX 78701
915-588-9686
evanpearson@quinnemanuel.com

**Aaron H. Perahia**
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 South Figueroa Street
10th Floor
Los Angeles, CA 90017
213-443-3000
213-443-3100 (fax)
aaronperahia@quinnemanuel.com

**Robert Schwartz**
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa Street
Los Angeles, CA 90017
213-443-3675
robertschwartz@quinnemanuel.com

**Dale Joseph Giali**
KING & SPALDING
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071
213-443-4355
213-443-4310 (fax)
dgiali@kslaw.com

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 12, 2025, at Newport Beach, California.

                         /s/Tina Gonzalez
                         Tina Gonzalez