**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

YANGTZE MEMORY TECHNOLOGIES,
INC., *et al.*,

      *Plaintiffs*,

   v.

MICRON TECHNOLOGY, INC., *et al.*,

      *Defendants*.

Civil Action No. 1:25-cv-01795 (CJN)

## <u>MEMORANDUM OPINION</u>

Yangtze Memory Technologies, Inc., and Yangtze Memory Technologies Co., Ltd.,

(collectively, YMTC) claim that Micron Technology, Inc., and DCI Group AZ, LLC, violated the

Lanham Act, 15 U.S.C. § 1125(a), by running an astroturfing campaign that discouraged

customers from purchasing memory chips from YMTC due to its connections to the Chinese

government.  ECF 1.  Micron and DCI move to dismiss.  ECF 21; ECF 24.  Because the

publications that YMTC challenges do not constitute commercial speech—and therefore cannot

be the basis for Lanham Act liability—the Court grants those motions.

## I.     Background

Headquartered in Wuhan, China, Yangtze Memory Technologies Co., Ltd., "is a leading

developer and manufacturer of advanced 3D NAND flash memory and related storage

technologies."[1]  ECF 1 ¶ 21.  Its U.S.-based subsidiary, Yangtze Memory Technologies, Inc.,

manages YMTC's American presence and business development.  *Id.* ¶ 22.  "YMTC has

---

[1] "[O]n a motion to dismiss," the Court of course "accept[s] as true the well-pleaded factual allegations of the complaint."  *Davis v. Billington*, 681 F.3d 377, 379 (D.C. Cir. 2012).

successfully designed and manufactured 3D NAND flash memory chips that set new benchmarks for bit density, input/output performance, and storage capacity." *Id.* ¶ 31.  Enticed by these technological advancements and lower prices, Apple selected YMTC to be its supplier of advanced memory chips in 2022.[2]  *Id.* ¶¶ 19, 34.

Micron competes against YMTC in the market for memory chips.  *Id.* ¶ 2.  "[T]hreatened by YMTC's ascension," Micron worked with DCI, a public affairs firm, "to erect a sophisticated . . . 'astroturfing' campaign . . . to damage YMTC's reputation and business for their own profit." *Id.* ¶¶ 2, 7, 23.  It funded a website called China Tech Threat that "purport[ed] to be focused on policy" but was actually a front "to disseminate favorable messages about Micron's products and disparaging messages about YMTC's competing products." *Id.* ¶¶ 8–10.

In September 2020, China Tech Threat began its "disinformation campaign." *Id.* ¶ 12.  A January 2021 blog post titled "As YMTC Booms, China Aims to Dominate Flash Memory Industry" asserted that YMTC was associated with "criminal activity, including a Social Security spoofing scam, identity theft and cyber extortion." *Id.* ¶ 12 & n.4 (quoting ECF 1-3 at 2).  And a June 2022 report titled "Silicon Sellout:  How Apple's Partnership with Chinese Military Chip Maker YMTC Threatens American National Security" implored "Apple to voluntarily end its partnership with YMTC" and "source its chips from existing suppliers like Micron." *Id.* ¶ 13 (alterations adopted) (quoting ECF 1-4 at 4).

YMTC alleges that China Tech Threat's "false and misleading statements caused YMTC to lose significant business opportunities and derailed ongoing negotiations with major customers

---

[2] The complaint refers to the large customer in question generically as "OEM Customer #1." *See, e.g.*, ECF 1 ¶ 34.  "OEM Customer #1" appears to be Apple given that YMTC challenges a publication that criticizes the deal between YMTC and Apple, *see id.* ¶ 13, and YMTC does not deny Micron's assertion that "OEM Customer #1 refers to Apple," ECF 24-1 at 28.

and technical partners." *Id.* ¶ 60. Most notably, Apple suspended its plans to purchase chips from YMTC in October 2022, resulting in "hundreds of millions of dollars in lost revenue." *Id.* ¶ 61. The astroturfing campaign also "inflicted lasting damage on YMTC's reputation and commercial standing across the technology sector." *Id.* ¶ 62.

In June 2025, YMTC filed this suit. ECF 1. Citing five statements from the China Tech Threat publications, YMTC raises claims of direct and contributory liability under the Lanham Act, which "prohibits deceptive trade practices such as false advertising and trademark infringement." *Farah v. Esquire Mag.*, 736 F.3d 528, 540 (D.C. Cir. 2013). Micron and DCI move to dismiss. ECF 21; ECF 24. Although they make other arguments, both contend that dismissal is required because the challenged publications are not commercial speech and are therefore not actionable under the Lanham Act.

## II.    Article III Standing

The Court begins, as it must, with jurisdiction. "Because Article III limits the constitutional role of the federal judiciary to resolving cases and controversies, a showing of standing is an essential and unchanging predicate to any exercise of [the Court's] jurisdiction." *Nat. Res. Def. Council v. EPA*, 755 F.3d 1010, 1016 (D.C. Cir. 2014) (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc)). Article III standing requires that a plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Causation requires that the injury is "fairly traceable to the challenged

3

action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (alterations adopted) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)).  And "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (quoting *Simon*, 426 U.S. at 38, 43).

DCI (but not Micron) contends that YMTC has failed to adequately allege that it has Article III standing.[3]  ECF 21 at 7–11.  As for injury in fact, YMTC alleges that "Defendants' false and misleading statements caused [it] to lose significant business opportunities and derailed ongoing negotiations with major customers and technical partners."  ECF 1 ¶ 60.  It details a specific example of Micron's and DCI's alleged actions causing it to lose a major customer: Apple.  *Id.* ¶ 61.  And YMTC explains that it "suffered substantial financial harm, including lost sales, forfeited market opportunities, and increased mitigation costs" and "lasting damage on [its] reputation and commercial standing across the technology sector."  *Id.* ¶ 62.  Given that "[e]conomic harm to a business clearly constitutes an injury-in-fact," *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014) (agreeing that "allegations of lost sales and damage to its business reputation give [a plaintiff] standing under Article III"), these allegations more than suffice.  DCI's

---

[3] Micron does not argue that YMTC lacks Article III standing.  *See* ECF 24-1.  Nonetheless, "it is well established that the court has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).  For the same reasons that YMTC has adequately pleaded that it has standing to pursue its claims against DCI, it also has adequately pleaded that it has standing to sue Micron.  Indeed, YMTC alleges that Micron was the mastermind behind the scheme to injure it.  *See* ECF 1 ¶ 24 (asserting that Micron "collaborated with DCI's co-located operations to plan, fund, direct, and oversee the challenged campaign, using DCI as its agent and instrumentality to execute a coordinated effort to damage YMTC's competitive standing while shielding Micron's own direct involvement").

suggestion—based on an outdated, out-of-circuit district court decision, *see Stahl L. Firm v. Judicate W.*, No. 13-cv-1668, 2013 WL 4873065, at *3, *6 (N.D. Cal. Sept. 12, 2013)—that YMTC must plead a competitive injury lacks any basis in the standard for pleading an injury in fact.

"Causation, or 'traceability,' examines whether it is substantially probable . . . that the challenged acts of the defendant, not of some absent third party, . . . cause[d] the particularized injury of the plaintiff." *Fla. Audubon Soc'y*, 94 F.3d at 663 (citation omitted). "It may be enough," however, "that the defendant's conduct is one among multiple causes." *Orangeburg v. FERC*, 862 F.3d 1071, 1080 (D.C. Cir. 2017) (quoting 13A Wright & Miller's Federal Practice & Procedure § 3531.5 (3d ed. 2008)). At the pleading stage, a plaintiff's "burden" to establish that its "injury is 'fairly traceable' to" the defendant's conduct "is relatively modest."[4] *Bennett v. Spear*, 520 U.S. 154, 171 (1997); *accord In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 61 (D.C. Cir. 2019).

YMTC pleads a plausible chain of events that links DCI's actions to YMTC's injuries. The complaint alleges that DCI directed China Tech Treat to publish a report in April 2022 that "implore[d] 'Apple to voluntarily end its partnership with YMTC' and 'source its chips from existing suppliers like Micron.'" ECF 1 ¶ 13 (alterations adopted) (quoting ECF 1-4 at 4); *see also id.* ¶¶ 8–10, 23–24, 37–38 (alleging facts about DCI's connections to China Tech Threat and Micron). It details how "[a]fter Defendants intensified their disinformation campaign in mid-2022—specifically targeting this relationship with fabricated security allegations—[Apple]

---

[4] DCI repeatedly relies on the Fifth Circuit's decision in *Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, to support its argument that YMTC cannot meet the causation requirement. 301 F.3d 329 (5th Cir. 2002). But that case was decided on summary judgment, which requires a higher evidentiary burden for establishing standing than on a motion to dismiss. *Id.* at 332–33.

suspended and ultimately abandoned plans to use YMTC chips as of October 2022." *Id.* ¶ 61; *see also id.* ¶ 62 (alleging "lasting damage on YMTC's reputation and commercial standing across the technology sector" more broadly). And it bolsters the link by asserting that "[t]his deception directly influenced and w[as] likely to influence the purchasing decisions of these audiences, causing them to refrain from purchasing products with YMTC chips and from doing business with YMTC, thereby directly and foreseeably harming YMTC's sales, revenue, and market share." *Id.* ¶ 70. Accepting these allegations as true—which the Court must do at this stage—"it is substantially probable . . . that the challenged acts of the defendant . . . cause[d] the particularized injury of the plaintiff." *Fla. Audubon Soc'y*, 94 F.3d at 663.

DCI's objection that warnings from sources other than China Tech Threat were the actual cause of YMTC's losses is premature and overstated.[5] DCI emphasizes that "the statements making up the alleged disinformation campaign allegedly impacting [Apple]'s decision-making . . . appeared in several other more prominent publications that are completely unaffiliated with DCI." ECF 21 at 10. "But the existence of, perhaps, an equally important player in the story does not erase [DCI]'s role." *Orangeburg*, 862 F.3d at 1080. On the facts as pleaded, it is plausible that YMTC's injuries are fairly traceable to DCI's alleged disinformation campaign—especially given that several of the statements cited by DCI as evidence of intervening causes postdate Apple's decision to suspend its deal with YMTC. *Compare* ECF 1 ¶ 61 (Apple abandons plans to

---

[5] YMTC moves for leave to file a sur-reply in part on the ground that DCI improperly raised a new argument about causation by citing additional pages of a June 2021 White House report in its reply. ECF 47 at 2–4. The Court denies that request because DCI's reliance on additional statements in the report—which was attached in full to DCI's motion—was not a "truly new" argument. *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F. Supp. 2d 270, 277 (D.D.C. 2002). And, in any event, as explained below, YMTC pleads enough at this stage to plausibly suggest that its injuries are fairly traceable to DCI's conduct even if there were other sources raising similar concerns about YMTC's connections to China.

6

use YMTC chips in October 2022), *with* ECF 21-1 at 3 (entity list designation from December 2022), *and* ECF 21-3 at 2 (Department of Defense publication from January 2024).  Although more evidence that the China Tech Threat publications, rather than other sources, caused customers not to do business with YMTC would likely be needed to establish standing at a later stage of the case, *see Lujan*, 504 U.S. at 561 ("[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."), YMTC has met its present burden.

### III.    Merits

The Lanham Act imposes liability on "[a]ny person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."  15 U.S.C. § 1125(a)(1).  "Every circuit court of appeals to address the scope of these provisions has held that they apply only to commercial speech." *Farah*, 736 F.3d at 541.  This limitation is based on the Lanham Act's text restricting liability to only where a speaker "uses in commerce" a "false or misleading description of fact, or false or misleading representation of fact" "in connection with any goods or services," 15 U.S.C. § 1125(a)(1), and the constitutional concern that "tak[ing] in broad swaths of noncommercial

speech would . . . 'intrude on First Amendment values,'" *Radiance Found., Inc. v. NAACP*, 786 F.3d 316, 322 (4th Cir. 2015) (quoting *Rogers v. Grimaldi*, 875 F.2d 994, 998 (2d Cir. 1989)). And, in any event, YMTC does not dispute that Micron and DCI can be liable under the Lanham Act only for commercial speech.[6]

"Whatever the commercial speech doctrine entails, commercial advertising is at least at the heart of the matter." *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 523 n.12 (D.C. Cir. 2015); *see also Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) ("[T]he core notion of commercial speech . . . [is] 'speech which does no more than propose a commercial transaction.'" (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976))). "Commercial speech is defined as 'expression related solely to the economic interests of the speaker and its audience' or 'speech proposing a commercial transaction.'" *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1143 (D.C. Cir. 2009) (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561–62 (1980)). "In addition to information related to proposing a particular transaction, such as price, it can include material representations about the efficacy, safety, and quality of the advertiser's product, and other information asserted for the purpose of persuading the public to purchase the product." *Id.* When evaluating whether a particular publication is commercial speech, the Court considers "the nature of the speech taken as a whole." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988); *see also Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 957 (9th Cir. 2012) ("When analyzing mixed-

---

[6] Although DCI raises a "statutory standing" argument in addition to its Article III standing argument, ECF 21 at 11–15, the Court need not (and does not) address that contention before analyzing the merits of the commercial speech issue. Despite its "misleading" label, the "statutory standing" inquiry merely asks the nonjurisdictional question whether there is "a cause of action under the statute." *Lexmark*, 572 U.S. at 128 & n.4.

content publications, . . . courts must determine as a threshold matter if a publication *as a whole* constitutes commercial speech." (emphasis added)).

As noted above, YMTC raises Lanham Act claims based on two publications from China Tech Threat. It takes issue with a 20-page report from June 2022 titled "Silicon Sellout" that detailed "how Apple's partnership with Chinese military chip maker YMTC threatens American national security." ECF 1-4 at 2. It also objects to a short blog post from January 2021 titled "As YMTC Booms, China Aims to Dominate Flash Memory Industry," which warned that "state-sponsored growth could position the People's Republic of China to unseat the United States as a leader in next-generation flash memory." ECF 1-3 at 2. Within these publications, YMTC claims that five statements are false and/or misleading:

- "YMTC is associated with criminal activity, including a Social Security spoofing scam, identity theft, and cyber extortion."

- "YMTC chips equipped with spyware and installed on Apple devices could funnel collected data back to Beijing."

- "YMTC chips . . . present the possibility that malicious technology . . . from the Chinese military could be introduced to Apple end-users."

- "YMTC chips could be . . . intentionally compromised with rogue features . . . . These built-in and concealed vulnerabilities would not be detected during manufacturing. They could be exploited . . . to disrupt performance or exfiltrate data."

- "Electronics with embedded chips are enabled with a 'kill switch' . . . . Such features, under Chinese military production, could be enabled . . . to shut down remotely by an unauthorized Chinese government actor."

ECF 1 ¶¶ 66, 80 (alterations in original). YMTC also makes much of the 2022 report's statement that "[i]deally Apple will voluntarily end its partnership with YMTC" and instead "can source its chips from existing suppliers like Micron, Kioxia, Samsung, SK Hynix, Western Digital, and Intel." ECF 1-4 at 4. But it does not argue—nor could it given the prescriptive and observational

9

nature of the comment—that this statement is false or misleading for purposes of Lanham Act liability.

Micron and DCI argue that the China Tech Threat publications (and the challenged statements therein) are not commercial speech. The Court agrees, whatever the formulation of the doctrine. Most obviously, the 2021 blog post and 2022 report do not constitute "expression related *solely* to the economic interests of the speaker and its audience." *Philip Morris*, 566 F.3d at 1143 (emphasis added) (quoting *Cent. Hudson*, 447 U.S. at 561). The blog post warned about the risk of China overtaking the United States in the flash memory industry and accordingly encouraged the Trump administration "to implement controls to stop the flow of [semiconductor manufacturing equipment] to China." ECF 1-3 at 2–3. Given this clear focus on national security concerns, the post was not primarily—much less solely—about economic interests. As for the report, although it at least arguably contained some references to economic competitors in the chip industry, the vast majority of it either outlined the foreign policy risks of the deal between YMTC and Apple or proposed potential solutions to mitigate those risks. *See* ECF 1-4 at 7–17. The report mentioned that the deal may have economic implications, but it was far from solely focused on that aspect.

The publications in question also do not amount to "speech proposing a commercial transaction." *Philip Morris*, 566 F.3d at 1143 (quoting *Cent. Hudson*, 447 U.S. at 562). In *Bolger v. Youngs Drug Products Corp.*, the Supreme Court laid out three relevant considerations for evaluating whether a publication "fall[s] within the core notion of commercial speech—'speech which does no more than propose a commercial transaction'": (1) whether the speech is "conceded to be [an] advertisement[]," (2) whether the speech "refer[s] to a specific product," and (3) whether the speaker had "an economic motivation." 463 U.S. at 66–67 (quoting *Va. State Bd.*, 425 U.S. at

10

762).  Once again, the 2021 blog post fails this test.  The post was a warning and call-to-action for the government to stop China, not an advertisement about YMTC or its products.[7]  To be sure, it did state that "YMTC is focused on 128-layer and 196-layer chips," but it did so to flag the company's growing market share rather than to promote or disparage those particular products.  ECF 1-3 at 2 (citation and internal quotation marks omitted).  And even if Micron, through DCI and China Tech Threat, would potentially benefit financially from seeing its competitor's reputation suffer, that general economic motivation cannot alone transform the specific means at issue here—a blog post flagging national security concerns—into commercial speech.  *See Taucher v. Born*, 53 F. Supp. 2d 464, 480 (D.D.C. 1999) ("Speech is not automatically considered commercial . . . simply because it concerns economic subjects or is sold for a profit." (citation and internal quotation marks omitted)).

The 2022 report is similarly not "speech proposing a commercial transaction."  *Philip Morris*, 566 F.3d at 1143 (quoting *Cent. Hudson*, 447 U.S. at 562).  The report was a policy paper, not an advertisement.  *See Bolger*, 463 U.S. at 66.  Given that "commercial advertising is at least at the heart of" "the commercial speech doctrine," *Nat'l Ass'n of Mfrs.*, 800 F.3d at 523 n.12, this non-advertising medium strongly counsels against YMTC's position.  Next, all the statements within the report that YMTC decries as false or misleading discussed potential risks of "YMTC chips" generally.  *See* ECF 1-4 at 5, 10–11.  It is doubtful that those references to a category of

---

[7] The other part of YMTC's motion for leave to file a sur-reply, ECF 47 at 4–6, argues that Micron changed its position in reply by stating that "[t]he first *Bolger* factor asks whether the articles 'are advertisements as that term is commonly understood,'" ECF 41 at 9 (quoting *Wash. Legal Found. v. Friedman*, 13 F. Supp. 2d 51, 64 (D.D.C. 1998)).  The Court also denies YMTC's request on this issue.  Micron could not and did not abandon the correct legal test, which is established by *Bolger* itself, and it was not a "truly new" argument for Micron to contend that the China Tech Threat publications were not advertisements under the ordinary meaning of that term, *Pogue*, 238 F. Supp. 2d at 277.

products satisfy *Bolger*'s second element, which concerns "reference[s] to a *specific* product." 463 U.S. at 66 (emphasis added). And, once more, any potential economic motivation Micron might have had for indirectly criticizing YMTC is not enough to transform a policy-focused publication not "made in the context of commercial transactions" into commercial speech. *Id.* at 68.

Ultimately, the publications are "political speech expressing a point of view, not commercial speech attempting to promote a good or service." *Nichols v. Club for Growth Action*, 235 F. Supp. 3d 289, 298 (D.D.C. 2017). Both lacked the hallmarks of advertising. They instead contained several indicators of advocacy, including calling for government—not consumer— action, *see, e.g.*, ECF 1-3 at 2 ("*The Trump administration* still has time to implement controls to stop the flow of SME to China . . . ." (emphasis added)); *id.* at 3 ("*[T]he United States* should restrict and 'decouple' its entire semiconductor industry from the People's Republic of China." (emphasis added)); ECF 1-4 at 4 ("[T]he report describes how *US policymakers* must restrict technology exports to and imports from YMTC." (emphasis added)), and providing policy—rather than purchase—recommendations, *see, e.g.*, ECF 1-3 at 3 (warning of "China's express strategy of Military-Civil Fusion for obtaining sensitive dual-use technology"); ECF 1-4 at 5 ("[I]ncreasing chip production in China runs counter to the strategy proposed by the U.S. Departments of Homeland Security and Commerce to mitigate information and communications technology (ICT) production risk and strengthen supply chain resiliency."); *id.* at 10 ("The Apple-YMTC deal presents risks to security, privacy, technology leadership, supply chain, and jobs."). YMTC's attempt to focus on only four statements out of a 20-page report and one sentence out of a two-page blog post cannot overcome the overwhelmingly political nature of the publications.[8] *See*

---

[8] That the China Tech Threat publications were forms of political advocacy also distinguishes this case from *Ariix, LLC v. NutriSearch Corp.*, which concerned a review guide "that compares and

*Riley*, 487 U.S. at 796 ("[W]e do not believe that the speech retains its commercial character when it is inextricably intertwined with otherwise fully protected speech.").

## IV.    Leave to Amend

YMTC requests that the Court grant leave to amend if it finds a deficiency in the complaint. ECF 36 at 42; ECF 37 at 31–32.  The Court declines to do so.  To start, YMTC's request appears procedurally improper because it provides no specifics as to how amendment could cure the defects identified above.  As the Court of Appeals has explained, "a bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought—does not constitute a motion [to amend] within the contemplation of Rule 15(a)." *Confederate Mem'l Ass'n, Inc. v. Hines*, 995 F.2d 295, 299 (D.C. Cir. 1993) (citation omitted).  In any event, leave to amend is not appropriate here because amendment would be futile.  *See Richardson v. United States*, 193 F.3d 545, 548–49 (D.C. Cir. 1999) (listing "futility" as one of the reasons that leave to amend should not be freely given).  The publications are noncommercial speech regardless of how an amended complaint might characterize them, and YMTC would therefore be unable to state a claim for relief under the Lanham Act even if the Court permitted amendment.

## V.    Conclusion

For the foregoing reasons, the Court grants Micron's and DCI's motions to dismiss, ECF 21; ECF 24, and denies YMTC's motion for leave to file a sur-reply, ECF 47.  The Court will issue an Order contemporaneously with this Memorandum Opinion.

---

reviews nutritional supplements sold in the direct marketing industry"—a much more commercial publication.  985 F.3d 1107, 1111 (9th Cir. 2021).

DATE:  August 13, 2026

CARL J. NICHOLS
United States District Judge